**SOUTHERN CALIFORNIA FEDERAL SAVINGS & LOAN ASSOCIATION; Socal Holdings, Inc.; Arbur, Inc.; Roy Doumani; Preston Martin; William E. Simon, Jr., J. Peter Simon, George J. Gillespie, III, Executors of the Estate of William E. Simon, Sr.; and Beverly W. Thrall, Successor to the Claims of Larry B. Thrall, Plaintiffs,**

v.

**The UNITED STATES of America, Defendant.**

No. 93–52C.

United States Court of Federal Claims.

Aug. 7, 2003.

Rosemary Stewart, Spriggs & Hollingsworth, Washington, D.C., attorney of record for Plaintiffs Southern California Federal Savings & Loan Association and SoCal Holdings, Inc. Monica A. Freas and Doreen J. Blauschild, trial counsel.

Richard C. Tufaro, Milbank, Tweed, Hadley & McCloy, New York City, attorney of record for Plaintiffs Arbur, Inc., and William E. Simon, Jr., J. Peter Simon, and George Gillespie, III, Executors of the Estate of William E. Simon, Sr. David S. Cohen, trial counsel.

Melvin C. Garbow, Arnold & Porter, Washington, D.C., attorney of record for Plaintiffs Roy Doumani, Preston Martin, and Beverly W. Thrall, Successor to the Claims of Larry B. Thrall. Howard N. Cayne, David B. Bergman, Michael A. Johnson, and Ida L. Bostian, trial counsel.

David C. Hoffman, Trial Attorney, Commercial Litigation Branch, Department of Justice, Washington, D.C., attorney of record for Defendant. With him on the briefs were Jeanne E. Davidson, Deputy Director, David M. Cohen, Director, and Stuart E. Schiffer, Deputy Assistant Attorney General. Delfa Castillo, Colleen A. Conry, Kenneth M. Dintzer, John N. Kane, Jr., Daniel D. McClain, Patrick T. Murphy, Brian L. Owsley, and Tonia J. Tornatore, trial counsel.

## OPINION

BASKIR, Judge.

### I. *Introduction*

This is a case against the United States by a California savings and loan association, its holding company, and the individuals who helped rescue the thrift's failing predecessor by forming and leading the new institution. In a previous opinion we held that the Plaintiffs had an express contract with the Defendant to treat as regulatory capital a $217.5 million capital credit provided by the Government in 1987 to the newly-formed Southern California Federal Savings and Loan Association and the $79.6 million in supervisory goodwill created as a result of SoCal's acquisition of Old Southern (its failing predecessor), and to amortize those amounts over a 25–year period. *See S. Cal. Fed. Sav. & Loan Assoc. v. United States,* 52 Fed.Cl. 531 (2002) (*Liability Opinion*).

Following the guidance of the U.S. Court of Appeals for the Federal Circuit and the U.S. Supreme Court in *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432,

135 L.Ed.2d 964 (1996) (*Winstar IV*), *aff'g*, 64 F.3d 1531 (Fed.Cir.1995) (*en banc*) (*Winstar III*), we further held that this contract was breached by the passage of the Financial Institutions Reform Recovery and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183 and its implementing regulations, which eliminated SoCal's ability to count goodwill as regulatory capital.

The Plaintiffs seek a variety of damages resulting from this breach. Following an extended trial on damages, we award the Plaintiffs some of these claimed damages, and deny others. In summary, we award SoCal and its holding company, SoCal Holdings, Inc., $65,397,821.41 in "wounded bank" and "cost of replacement capital" damages.

We award $12,891,113.75 in "dilution" damages to the "Simon Plaintiffs," Arbur, Inc. and William E. Simon, Jr., J. Peter Simon, and George J. Gillespie, III, the Executors of the Estate of William E. Simon, Sr. In addition, we award $6,223,280.00 in "dilution" damages to both Mr. Roy Doumani and Mrs. Beverly W. Thrall, the Executor of the Estate of Larry B. Thrall. Finally, we award Mr. Preston Martin $3,333,900.00, also in "dilution" damages.

## II. *Background*

In our opinion resolving liability, we reviewed the history of the *Winstar* litigation and explained the case management process set up by the Court of Federal Claims to resolve the approximately 120 cases filed in the wake of the *Winstar* decisions. In addition, we set forth in detail the transaction at issue in this case and the documents that formed the binding contract on which the Plaintiffs now claim damages. Before setting forth the facts found at the trial on damages, a review of the procedural history and the parties to the instant case provides context to this Opinion.

### A. Parties

In the mid–1980's, one-hundred-year-old Southern California Savings and Loan Association (Old Southern), based in Beverly Hills, California, a large institution with assets in the $1 billion range, was suffering "serious asset problems" from "large operat-

ing losses, weak management, poor quality control and underwriting standards, and large contingent liabilities." *Liability Opinion*, 52 Fed.Cl. at 533 (citations omitted).

On June 7, 1985, the Federal Home Loan Bank Board (FHLBB), pursuant to its statutory authority over Federally insured savings institutions, placed the insolvent thrift into receivership under the control of the Federal Savings and Loan Insurance Corporation (FSLIC). For the next year, as an alternative to liquidating the thrift and expending the FSLIC's limited insurance funds, the FHLBB and FSLIC solicited prospective purchasers or merger partners who might rescue the deeply troubled institution. *Id.*

In response to these solicitations, the late former U.S. Treasury Secretary William E. Simon, Sr. formed a group of investors including, among others, former Federal Reserve Vice–Chairman and former FHLBB Chairman Preston Martin, California real estate investors Roy Doumani and the late Larry B. Thrall, and Arbur, Inc., an investment company owned by Secretary Simon and his children. In late 1986, Secretary Simon's group submitted to the FSLIC a bid to acquire the thrift. The members of Secretary Simon's group are referred to collectively as the "Individual Plaintiffs."

The Individual Plaintiffs proposed to form and capitalize personally a holding company, to be named SoCal Holdings, Inc. (SCH), which would in turn purchase the failing thrift and form a new savings and loan association. Upon Government approval, the new association, named Southern California Federal Savings and Loan Association (SoCal), would acquire all of the assets and liabilities of its predecessor. The group's proposal contained a business plan which it believed would return SoCal to solvency and, eventually, profitability. Together, SoCal and its holding company are referred to as the "Institutional Plaintiffs" or the "SoCal Plaintiffs."

### B. Procedural Background

The Plaintiffs initiated this lawsuit in 1993. Two years later, on August 2, 1995, the Plaintiffs filed a first amended complaint al-

leging that, by enacting FIRREA in 1989, the Government breached an express contract (Count 1), an implied-in-fact contract (Count 2), and the duty of good faith (Count 3). The Plaintiffs also seek restitution for breach of the alleged contract (Count 4), and further allege that the Government committed a taking without just compensation (Count 5) and violated the Plaintiffs' due process rights (Count 6). The Complaint and the Amended Complaint, and supporting documents, were originally filed under seal. We unsealed those and other documents, and lifted the *Winstar*-related Amended Master Protective Order from its application to this case last year. *See S. Cal. Fed. Sav. & Loan Assoc. v. United States*, 52 Fed.Cl. 20 (2002).

Since 1995 some of the parties' names have changed. On July 1, 1997, SoCal changed its name to People's Bank of California and SoCal Holdings, Inc. to PBOC Holdings, Inc. Four years later, on November 13, 2001, People's Bank of California merged with California National Bank, with California National Bank the surviving institution. California National Bank is the successor-in-interest to SoCal and, together with PBOC Holdings, Inc., continues to pursue the thrift's claim on behalf of the named plaintiffs, Southern California Federal Savings and Loan Association and SoCal Holdings, Inc. For ease of reference, the parties and the Court continue to refer to the Institutional Plaintiffs as SoCal and SCH.

Upon Mr. Thrall's death in 1998, Beverly W. Thrall, Mr. Thrall's wife, was substituted as a Plaintiff, pursuant to Court of Federal Claims Rule 25(a). Upon Secretary Simon's death in 2000, William E. Simon, Jr., J. Peter Simon, and George Gillespie, III, the Executors of the Estate of William E. Simon, Sr., were substituted as Plaintiffs, also pursuant to Rule 25(a). Because Mr. Doumani, Mr. Martin, and Mrs. Thrall eventually obtained their own counsel and submitted individual pleadings on their behalf, we refer to this group as the "DMT Plaintiffs." Likewise, Arbur, Inc. and the Executors of Secretary Simon's estate are referred to as the "Simon Plaintiffs."

Several participants to the 1987 transaction are not present in this case. The Ar-iadne Group, an original investor in SoCal, filed its own independent complaint on these same facts. Its case was dismissed as untimely under the governing statute of limitations. *See Plaintiffs in Winstar–Related Cases v. United States*, 37 Fed.Cl. 174, 182–84 (1997), *aff'd, Ariadne Fin. Serv. Pty. v. United States*, 133 F.3d 874 (Fed.Cir.1998). Its motion to intervene in this case was also denied. *See S. Cal. Fed. Sav. & Loan Assoc. v. United States*, 51 Fed.Cl. 114 (2001). FIMA, another original SoCal shareholder, apparently did not join in this complaint or file its own.

In addition, two members of Secretary Simon's original group did not join in either the 1993 complaint or the 1995 amended complaint. Mr. Craig Godsen, an investor and party to the 1987 contract, has never sought to be a party to this lawsuit. Another contract signatory, former assistant Treasury Secretary Gerald Parsky, filed his own independent lawsuit related to the SoCal transaction. Mr. Parsky's complaint was also dismissed on statute of limitations grounds, as was his motion to intervene. *See S. Cal. Fed. Sav. & Loan Assoc. v. United States*, 51 Fed.Cl. 676 (2002) (denying reconsideration); *see also* 52 Fed.Cl. 444 (2002) (denying intervention).

On May 10, 2002, the Court issued its fifth published opinion in this litigation and addressed Count 1 of the Plaintiffs' Amended Complaint. *See Liability Opinion*, 52 Fed. Cl. at 531. In that opinion, we found that both the Institutional Plaintiffs and the Individual Plaintiffs were parties to an express contract with the Government that it breached upon the enactment of FIRREA and its implementing regulations. In dismissing each of the Defendant's defenses, we noted that at least six Justices on the Supreme Court, and numerous Federal Circuit and Claims Court judges had rejected these defenses repeatedly. *See Id.* at 544–48.

Trial was held in this case for two months in the summer of 2002. Thereafter, the parties engaged in lengthy post-trial briefing, and submitted extensive proposed findings of fact. Consequently, this Opinion is the product of over one hundred hours of detailed expert and fact witness testimony, thousands

of exhibits, a five thousand page trial transcript, hundreds of pages of post-trial briefing, and excellent advocacy on the part of the twenty-some attorneys who participated in the trial.

### III. *Findings of Fact*

#### A. Contract Formation

The facts we recite are taken from the Liability Opinion, as well as from trial testimony and exhibits.

The Individual Plaintiffs' bid proposal regarding Old Southern was conditioned upon the receipt of substantial direct financial assistance from the Government and certain regulatory forbearances regarding minimum capital requirements. Capital requirements are "minimum reserves"—computed as a percentage of total liabilities—that the Government requires a savings and loan to maintain. *Winstar III*, 64 F.3d at 1535. The failure to "comply with minimum regulatory capital requirements [has] severe repercussions for a thrift." *Id.*

As then-Chairman of the U.S. Securities and Exchange Commission Richard C. Breeden noted in 1991:

> Capital requirements are the most powerful source of discipline for financial institutions. When maintained at an appropriate level, capital requirements reduce the incentive to take excessive risks and provide a cushion against loss.

Richard C. Breeden, "Thumbs on the Scale: The Role That Accounting Practices Played in the Savings and Loan Crisis," 59 *Fordham L.Rev.* S71, S75 (1991), cited with approval in *Winstar IV*, 518 U.S. at 845–851, 116 S.Ct. 2432.

The bid also specifically proposed that the newly formed institution would account for the transaction "under purchase accounting" and that:

> any excess of fair value of liabilities over the fair value of assets would be recorded as an intangible asset ("goodwill") which would be amortized over 25 years using

the straight-line method, without adjustment for any reason.

Bid Proposal, at p. 8–9.

The purchase method of accounting is a generally accepted accounting practice (GAAP) for mergers. *See Winstar III*, 64 F.3d at 1535.

In January, 1987, the FSLIC accepted the Individual Plaintiffs' bid in principle and thereafter a series of exchanges took place to complete the deal. Although the dollar amount of the Government's direct cash contribution changed several times, the essential form of the transaction—a supervisory conversion using the purchase method of accounting and the infusion of cash from both the Government and several private parties—remained constant.

This transaction was executed on April 30, 1987, and was embodied in a series of interrelated documents signed by various of the parties, including the FSLIC, FHLBB, SoCal, SCH, and the Individual Plaintiffs. These documents include:

(1) Assistance Agreement (AA), signed by FSLIC, SoCal, SCH (JX 1427);

(2) Regulatory Capital Maintenance Agreement (RCMA), signed by FSLIC, SoCal, SCH, and each Individual Plaintiff (JX 1428);

(3) FHLBB Resolution No. 87–511, reciting the particulars of the transaction; approving the supervisory conversion from a mutual to a stock association; approving the use of the capital credit in meeting regulatory minimum requirements; and approving the use of the purchase method of accounting with a 25–year amortization period (JX 1425);

(4) FHLBB Implementation Resolution No. 87–513, approving the FSLIC's expenditure of money to the new association (JX 1425); and

(5) Forbearance Letter from FHLBB to SCH (dated May 27, 1987), approving the use of the purchase method of accounting and the use of the FSLIC cash contribution towards meeting the regulatory capital requirements (JX 1426).

The Assistance Agreement contained the following integration clause:

This Agreement, together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with it, excepting only any resolutions or letters concerning the Conversion, the Acquisition or this Agreement issued by the Bank Board or the [FSLIC] in connection with the approval of the Conversion, the Acquisition, and this Agreement.

Assistance Agreement, sec. 18(a).

There is no disagreement among the parties that the documents referred to in the integration clause included, at a minimum, the RCMA, as well as FHLBB Resolutions 87–511 and 87–513, and the FHLBB Forbearance Letter to SCH.

Together these documents recited the following cash components of this complex transaction. First, the Individual Plaintiffs arranged for the infusion of approximately $40 million in private funds into SoCal and SCH. Second, after the FSLIC converted SoCal from a mutual savings and loan association to a stock savings and loan association, the new holding company purchased all of SoCal's common stock. Third, the FSLIC made a direct cash contribution to SoCal in the amount of $217.5 million, known throughout the *Winstar* litigation as the FSLIC "capital credit."

The private funds originated from a variety of sources. Two investment companies, Alapim Holdings, B.V., a Netherlands corporation (whose successors-in-interest are Ariadne Financial Services Partnership, Ltd. and Memvale Partnership, Ltd., collectively referred to as the "Ariadne Group") and FIMA Finance Management, Inc. (FIMA), purchased 100,000 shares of SoCal preferred stock for $33.3 million and 100,000 shares of SCH preferred stock for $1.7 million. The Ariadne Group also loaned the individual members of Secretary Simon's group a total of $5.8 million. The Individual Plaintiffs then used most of those funds ($5.1 million) to capitalize the holding company. In return, the Individual Plaintiffs received differing amounts of SCH common stock.

The corporate structure of SCH dictated that any profits of SoCal were to be split 60/40 in favor of the common stock holders. The Simon Plaintiffs and their attorney Gerald Parsky (who is not a party) both received the largest shares of the common stock, each holding 29.744% of the shares. Mr. Doumani and Mr. Thrall received 14.359%, while Mr. Preston received 7.692%. The other non-party investor, Mr. Gosden, received 4.103%. These percentages are important to note so that the Court can trace what happened to the Individual Plaintiffs' ownership interest throughout the period in dispute. They also form the basis for the award to the Individual Plaintiffs. It is also important to note that the Individual Plaintiffs were not just involved with SoCal; as a group, they participated in transactions with at least two other savings and loan associations. *See, e.g.,* *Westfed Holdings, Inc. v. United States*, 55 Fed.Cl. 544 (2003).

The primary Government documents approving the merger, FHLBB Resolution 87–511 and the FHLBB Forbearance Letter, required SoCal to submit to the FSLIC professional opinion letters regarding the transaction. First, SCH and the Individual Plaintiffs, no later than thirty days after the close of the transaction, were required to submit an opinion of counsel letter stating, among other required items, that the AA and the RCMA "constitute valid and binding obligations" upon SoCal, SCH and the Individual Plaintiffs. Res. 87–511, paras. 12–13. Second, SoCal and SCH were required to submit an "analysis accompanied by a concurring opinion from independent public accountants" verifying that SoCal accounted for the transaction under GAAP, except where the FHLBB and the FSLIC granted SoCal exceptions from compliance with GAAP. Res. 87–511, p. 13; Forbearance Letter, para. 2. The parties all agree that these documents were submitted in accordance with the conditions set forth in the FHLBB Resolution and Forbearance Letter.

The transactional records also contained several crucial mutual promises running between various of the parties. First, the RCMA, which was signed by the FSLIC, SoCal, SCH, Arbur, in their corporate capac-

ities, and Messrs. Doumani, Martin, Simon, and Thrall in their individual capacities, contained a personal guarantee from each of the Individual Plaintiffs to infuse up to an additional $5 million dollars into SoCal should its capital fall below a certain level. RCMA, sec. 4.

Second, the RCMA specifically stated that SoCal could credit the $217.5 million Government capital contribution towards its regulatory net worth account. RCMA, sec. 1; Res. 87–511, para. 21(b); Forbearance Letter, para. 2(a).

Third, as proposed, SoCal could account for the acquisition using the purchase method of accounting, which brings about the recognition of goodwill for accounting purposes. AA, sec. 13; Res. 87–511, para. 21(a); Forbearance Letter, para. 2(b). Because the FSLIC supervised all transactions at issue in these *Winstar* cases, this goodwill has become known as "supervisory goodwill." On April 30, 1987, SoCal booked approximately $79.6 million in supervisory goodwill.

Fourth, FHLBB approved SoCal's request that the supervisory goodwill could be amortized over twenty-five years using the straight line method. Res. 87–511, para. 21(c); Forbearance Letter, para. 2(b).

Fifth, the RCMA also contained a clause that if the regulatory capital fell below 3% of SoCal's assets, the FSLIC could repossess the institution. RCMA, sec. 7. This provision of the RCMA, along with the Individual Plaintiffs' personal cash guarantee, is key to understanding the deal. The Government specifically required the Individual Plaintiffs to sign and execute the RCMA before it would "provide [the] financial assistance and indemnification[s] set forth in the Assistance Agreement." RCMA, Recital "E", p. 2. The experience and reputation of Secretary Simon's investment group was considered an important intangible asset in the rejuvenation of the thrift. The personal guarantees represented by their individual signatures provided extra security to the Government that the Individual Plaintiffs would not walk away from the ailing thrift. This document imposed obligations on the private signatories for up to 12 years.

Taken together, the intangible goodwill promise and the tangible capital credit represented almost $300 million of Government assistance, direct and indirect, in exchange for the Individual Plaintiffs' time, leadership, and money in rescuing the failing thrift. The cost to the Government to liquidate the thrift and close it down was approximately $235 million, by at least one estimate at that time. As the Government document approving the acquisition stated, the FSLIC's expenditure of over $200 million, the use of goodwill, and "the acquisition of SoCal by SoCal Holdings ... lessen[ed] the risk to the FSLIC." Res. 87–511, Marketing and Acquisition Finding No. 6, p. 17.

The Court previously found that all of these documents together constitute a "Final Contract," integrating the whole transaction, and creating mutually supporting obligations between the Government and each of the Plaintiffs. *See Liability Opinion,* 52 Fed.Cl. at 549.

**B. Note on MACRO/CAMEL Ratings**

The FSLIC, and later the Office of Thrift Supervision (OTS) and the Federal Deposit Insurance Corporation (FDIC), conducted periodic, regular full-scope and special, occasional examinations of SoCal and SCH, as they did of other thrifts. These examinations included an assessment of the following areas: the effectiveness of the management and the Board of Directors, asset quality, capital adequacy, asset/liability and risk management, and earnings (operations). Originally going by the anagram MACRO, the denomination changed to CAMEL (capital, assets, management, earnings, liability) after FIRREA. The examiner would then prepare an exam report and assign ratings for each individual category, and one overall composite rating. Despite its formal status as a composite or uniform financial institution rating, the testimony of the various regulators and experts made clear that a thrift's capital position was the heaviest weighted of the categories.

Under the composite rating definitions, institutions were rated on a numerical basis: institutions that are a(1) are sound in every respect and give no cause for supervisory

concern; institutions that are a(2) are fundamentally sound, but may reflect modest weaknesses that are correctable in the normal course of business; institutions that are a(3) exhibit a combination of financial, operational, or compliance weaknesses ranging from moderately severe to unsatisfactory, although the possibility of failure is remote; institutions that are a(4) have an immoderate number of serious financial weaknesses or a combination of other conditions that are unsatisfactory, they are subject to operational limitations and special scrutiny; and institutions that are a(5) have an extremely high immediate or near-term probability of failure, and will require some form of emergency assistance, merger, or acquisition. *See* JX 1152 at ii (OTS Report of Examination, Feb. 9, 1995).

The parties regularly referred to SoCal's MACRO or CAMEL ratings at various points throughout the trial as a uniform system to describe the condition of the thrift at a given point in time, and we shall do the same.

### C. Post–Contract Operations

As of February 1987, just two months before the contract was signed, Old Southern was operating with a net worth of negative $160.7 million and was incurring additional losses averaging $500,000 per month. *See* DX 28 (Memorandum from Alvin W. Smuzynski of the Federal Home Loan Bank System to Jeff Sconyers re: Acquisition of Southern California S & LA by SoCal Holdings, Inc., Apr. 28, 1987). Thus, by the time of the Acquisition, Old Southern had a MACRO rating of 5.

Accordingly, as Mr. Martin testified regarding the regulatory goodwill of $79.6 million and the capital credit of $217.5 million, the "[t]he promise of that $300 million [in regulatory capital] was the number one factor in our acquiring this institution. Without that $300 million, we would have said to them, this is 100–year–old institution, it's a mutual, its management record up to date is inadequate, and no, we don't want to buy Southern California, thank you." Tr. at 443.

As we have noted, the Government's contractual regulatory capital promises provided a substantial capital cushion that gave added protection to the Plaintiffs' investment, and were central to the new ownership team's business plan. More capital permits a thrift to grow by adding more deposits and borrowings. These funds can then be invested in earning assets. *See Liability Opinion*, 52 Fed.Cl. at 548; PX 0340A–C (Charts Outlining "How Thrift's Make Money").

Shortly after the 1987 Acquisition, Mr. John M. Yunker, Jr., was hired as the president and chief operating officer of SoCal. Mr. Yunker immediately began hiring senior managers for the key positions at SoCal. Among the officers hired by Mr. Yunker was E. John Doyle as Senior Vice President for retail banking, who also testified at trial.

SoCal's new management faced significant challenges following the 1987 acquisition. The testimony and vast documentary evidence illustrate the depth and range of problems plaguing SoCal's lending operations, accounting functions, public image, and branch system by the time the new board of directors and management team were in place. Further, SoCal was burdened with a great number of inherited problem assets and lawsuits. Mr. Yunker testified that Old Southern "had been operating as a troubled institution, it was well-known that they were a failed institution," and SoCal had to "get back into a marketing program and reestablish our reputation as a viable, profitable institution, not as a failed institution. We were carrying a lot of baggage." Tr. 804–805.

SoCal's approved Business Plan focused on providing economical home financing and other financial products to its customers and a safe place to deposit their funds. *See* PX 0232 (SCH 5–Year Business Plan). The approved Business Plan projected growth in SoCal's assets from approximately $1 billion to $3.7 billion between 1987 and 1992.

Mr. Eric D. Shand, a FHLBB (and later OTS) supervisory agent and Western Regional Director, testified at trial and recalled SoCal's plan to grow significantly while maintaining compliance with its regulatory capital requirements. *See* Tr. 4106. Mr. Shand acknowledged that the FHLBB was fully

aware of SoCal's plan to grow to over $3.5 billion in asset size. *See* Tr. 4110.

Because SoCal was a "start-up operation," its approved Business Plan did not project net income until 1990. *See* PX 0232 (Business Plan). The Government's supervisory agents concurred that, at this time, SoCal was "essentially a start-up operation." *See, e.g.*, DX 66 at 2 (Memorandum from OTS Supervisory Agent Sidney Mar to Messrs. Shand, Chin, Lee and McManus re: Southern California FS & LA, Jan. 12, 1988); Tr. 3585(Mar); Tr. 4041, 4113–4114 (Shand).

This start-up operation had to rebuild its branch system. As Mr. Doyle said, the "physical facilities were in poor shape and had not been refurbished in years, the carpets were threadbare, and the branches needed painting." Tr. 583.

SoCal had to dispose of or reduce its problem assets, write off its failed loans, and settle the numerous lawsuits against it. New management's task was also to improve operating efficiency, reduce its funding costs, and revise its investment and risk management policies.

It also badly needed to attract new deposits. SoCal President Yunker testified that the core deposits had materially weakened and had runoff significantly during the period of Old Southern's receivership. *See* Tr. 805.

The new management team was very successful during the period 1987–1989 in resolving many of these problems. In a July 1989 memo to the SCH Board of Directors, Mr. Yunker noted that by that date, among other things, all of the key management had been hired, policies and internal controls were in place in all major operating areas, core operations continued to improve, major problem assets had been substantially resolved, more than 100 lawsuits had been settled or terminated, branch deposits had been expanded significantly, the loan department had been rebuilt, and an institutional and retail money desk operation was started and had grown to over $200 million. *See* PX 0026 at 3, 4 and 5 (Memorandum from John M. Yunker to Larry Thrall re: Thrift Partners L.P.—Due Diligence, July 17, 1989); *see also* PX 0049 (Letter from John M. Yunker to Larry Thrall, summarizing condition of SoCal at acquisition and turn around progress through August, 1991).

The several Government regulators that testified were questioned regarding the numerous comments about SoCal's management throughout the pre-and post-breach periods that appeared in the contemporaneous Government reports. Indeed, the FHLBB exam reports and correspondence were complimentary of SoCal's management as it began the turnaround of Old Southern and the start-up of the new SoCal. For example, FHLBB acknowledged in 1988 the extensive experience of SoCal's senior management. *See e.g.*, DX 75 (Memorandum from D.A. Worthington of Federal Home Loan Bank of San Francisco to J.M. Cirona re: Credit Committee Agenda for the February 1988); PX 0207 (Memorandum from Tom C. Wilson of the Federal Home Loan Bank of San Francisco to Greg R. Reniere re: Southern California Savings Visit, Sept. 17, 1991, stating: "management has done an excellent job of running the institution. . . ."). The April 23, 1990, FDIC Report of Examination stated:

> as a workout team, current management has done well. . . . Much in the way of operating improvements and problem asset collections are attributed to him [current president, John Yunker]. . . . The chief financial officer, Jeff Kniffen, appears very knowledgeable of and most effective in dealing with accounting issues.

JX 1163 at A–1.

By June 1988, SoCal's MACRO rating had improved to 3. *See* Tr. 3610–3611(Mar). It remained a 3 after the FHLBB's targeted examination of SoCal in January 1989. *See* Tr. 447–448 (Martin); JX 1138 at 4 (Jan.1989 OTS Exam Report).

By 1989, SoCal had grown its existing branches, bringing the average branch size up from $30 million to just above $40 million in deposits, at the same time reducing branch operating expenses from roughly 95 basis points to 70 basis points. *See* Tr. 626–627 (Doyle).

SoCal President Yunker testified that So-Cal was in fact *ahead* of the growth projections in the plan. Tr. 834. SoCal grew from approximately $900 million at the time of the Acquisition to approximately $2.3 billion by 1989. *See also* PX 0176 at 10 (Letter from John M. Yunker to Sidney C. Mar re: So-Cal's response to the Supervisory Examination, Sept. 27, 1989). The Government's principal expert witness, Dr. William Hamm, acknowledged SoCal's growth of over one billion dollars by 1989 despite the tightening of the market, a decline in mortgage originations, and increased competition from other California thrifts. *See* Tr. 3266–3268; *see also* DX 1108 (Graph Depicting "1–4 Residential Mortgage Originations, By Lender Group").

As of December 31, 1989, if SoCal had retained its contractual capital, its capital ratio would have been 11%, high above the 7.42% average for the 45 thrifts in California with the highest capital ratios. *See* Tr. 1387–1388; PX 0316 (Chart Depicting SoCal's Contractual Capital Ratios vs. All 182 California S & Ls—GAAP Capital Ratios as of Dec. 31, 1989, Taken from the Thrift Financial Reports). According the SoCal Plaintiffs' principal expert witness, Dr. Paul M. Horvitz, a professor of finance and an expert in the management of financial institutions, SoCal was unique in terms of the large amount of excess capital it had. *See* Tr. 4850–4851.

### D. The Breach

And then came FIRREA. As then-Senate Minority Leader Robert J. Dole stated during a June 1989 White House Press Conference with President George H.W. Bush, referring to the pending legislation:

> It seems to me it's sort of a time bomb that might go off one of these days unless we have a very strong piece of legislation, stripped of all the special interests amendments, and knock out the goodwill wherever you can. There isn't much good-will for S & Ls, I find, around.

In response to Senator Dole's comments, President Bush, urging Congressional passage of his S & L legislation, now known as FIRREA, stated:

> I think that every American citizen has every right in the world to be disturbed and shocked by this situation.... And now some of the smaller—or the weaker S & L's, I would say, are demanding the right to continue to treat goodwill as capital, even though goodwill has no tangible value. And the result could be that—up to $600 billion in loans without one dollar in real capital for decades to come. And in my view, it is time for the American public and our administration to say that enough is enough.

Remarks at a White House–Congressional Leadership Meeting, June 14, 1989 (emphasis added).

Clearly, this was a high—if not the highest—domestic priority for the newly elected President. And just as clear is the fact that the Government was aware that a central aspect of FIRREA was the provision cancelling supervisory goodwill. By August 1989, Congress had passed, and the President had signed, a massive piece of legislation with far-reaching and immediate effects.

As discussed in the Liability Opinion, under FIRREA, "Congress expressly restricted the continued use of supervisory goodwill to satisfy regulatory capital requirements." *Winstar III*, 64 F.3d at 1538. FIRREA established three new minimum capital standards: "tangible" capital, "core" capital, and "risk-based" capital. 12 U.S.C. § 1464(t). After FIRREA's enactment, goodwill "could not be included at all in satisfying [the new] minimum *tangible* capital" requirements and only a certain amount of goodwill was permitted to be counted towards the new minimum core capital requirements. *Winstar III*, 64 F.3d at 1538 (emphasis added). The amount of goodwill includable in the core capital requirements was phased out entirely on December 31, 1994. *Id.* Further, the amortization period for goodwill was limited to twenty years. 12 U.S.C. § 1464(t)(9)(B).

As Mr. Yunker testified, "[e]ven though it was by stroke of pen, in the case of FIRREA, we became a troubled institution. Before that, we were very strong in terms of capital position." Tr. at 824.

Two days after the enactment of FIRREA, the OTS determined that SoCal did not meet the new capital requirements and SoCal would have to be recapitalized or face seizure. *See* Tr. at 1405–1408 (Horvitz). After a special review, August 11, 1989, SoCal's MACRO rating was downgraded from a 3 to a 4. *See* JX 1141 (OTS Special/Limited Report of Examination, Aug. 11, 1989). This rating—and the reason for the rating—continued over the next three years.

OTS promptly notified SoCal that it was a "troubled association" because it had a "substantial capital deficiency under the tangible capital requirements." *See* PX 0053 (Letter from OTS Agent Mar to SoCal Board of Directors, Aug. 30, 1989). In that letter, Agent Mar also invoked the provisions of OTS Memorandum RB 3a, which provided, as a general rule, that a troubled institution would be permitted little or no growth. SoCal had to submit a capital restoration plan that, among other things, prohibited a troubled institution from increasing its liabilities in excess of the amount of interest credited, or approximately $45 million per year. *See* PX 0049 at 1 (Yunker Letter to Thrall, Aug. 30, 1991); Tr. 945–947 (Yunker). Further, the regulators testified that SoCal had to seek OTS and later, FDIC, approval for all material transactions.

The immediate effect of the breach on SoCal was the wiping out of its regulatory capital and this led "very directly" to cessation of growth, a shrinkage of assets and liabilities, and the inability of SoCal to carry out its approved Business Plan. *See* Tr. 1401 (Dr. Horvitz).

Even taking into account all of the losses SoCal suffered prior to 1989, *absent the breach*, SoCal would have had ample capital to meet the new regulatory requirements imposed by FIRREA. *See* Tr. 1542–47 (Dr. Horvitz). In fact, as of December 31, 1989, SoCal had $258.7 million in regulatory capital. This includes the unamortized portion of the $217.5 million capital credit and $79.6 million supervisory goodwill received as part of the acquisition. The capital requirement at that time was 3% of assets, which amounted to $70 million. Thus, SoCal had excess capital in the amount of $188 million under the previous capital definitions.

After FIRREA and its new capital definitions, SoCal had tangible capital of negative $72,000 when the requirement was $34.18 million. Thus, after the breach, SoCal had a deficit tangible capital position of approximately $34.25 million, instead of an excess of $188 million. *See* Tr. 1406–09 (Horvitz; PX 0289 (Chart Depicting Impact of FIRREA on SoCal's Tangible Capital as of Dec. 31, 1989)); PX 0295 (Chart Depicting Impact of FIRREA on SoCal's Regulatory Capital as of Dec. 31, 1989).

Core capital is essentially GAAP capital, except for some adjustment of intangible assets. Core capital is total assets minus liabilities, but certain assets such as supervisory goodwill and capital credits are deducted. FIRREA phased-out the supervisory goodwill over a period of several years until 1994. It allowed supervisory goodwill to count only up to an amount equal to 1 ½% of assets.

In SoCal's case this permitted retention of $34.18 million of qualifying supervisory goodwill, but that still left SoCal in a core capital deficit position of approximately $35.28 million. By 1994, the end of the FIRREA phase-out period, if nothing else changed, SoCal would have been in a negative $68.43 million core capital position. *See* Tr. 1407 (Horvitz); PX 0290 (Chart Depicting Impact of FIRREA on SoCal's Core Capital as of Dec. 31, 1989).

Risk-based capital, another FIRREA capital category, is based on a thrift's capital in terms of the riskiness of each of its assets and risk-weightings are applied accordingly. If one looked at SoCal's regulatory contractual capital as a percentage of assets, SoCal would have had a risk-based capital ratio of 23% before FIRREA. Immediately after the breach, SoCal's risk-weighted capital would have been 3.46%, including the capital allowable during the phase-out period. After the phase-out period, SoCal's risk based capital would have been close to zero, while the risk-based capital requirement after FIRREA was 8%. Thus, instead of having a substantial surplus after the breach, SoCal was immediately in a deficit position for this kind of capital as well. *See* Tr. 1408–1409 (Horvitz);

PX 0291 (Revised Chart Depicting Impact of FIRREA on SoCal's Risk–Based Capital as of Dec. 31, 1989).

We did not reach a conclusion in our Liability Opinion as to whether the breach was total or material. As with our earlier opinions, we can rely upon the conclusions of both this Court, and the Federal Circuit. As noted by Judge Christine Miller in *Hansen Bancorp v. United States,* "[i]n order to avoid proving causation, plaintiffs must establish that the [OTS] regulations constituted a total breach of the Assistance Agreement." 53 Fed.Cl. 92, 104 (2002). As the Supreme Court stated in *Mobil Oil Exploration & Producing Southeast, Inc. v. United States:*

a breach by non-performance gives rise to a claim for total breach only if it so substantially impairs the value of the contract to the injured party at the time of breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance.

530 U.S. 604, 608, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000) (quoting Restatement (Second) of Contracts § 243).

The Supreme Court in *Winstar* stated clearly that the favorable accounting treatment of supervisory goodwill and capital credits as regulatory capital were "essential to supervisory merger transactions." 518 U.S. at 849, 116 S.Ct. 2432. Similarly, in two damages opinions, the Federal Circuit has stated that the breach caused a loss of "substantial value." *Glendale Fed. Bank v. United States,* 239 F.3d 1374, 1381 (Fed.Cir.2001); *California Fed. Bank v. United States,* 245 F.3d 1342, 1351 (Fed.Cir.2001). The Court in *Hansen* concluded that the Government's breach was "total" and we agree. 53 Fed.Cl. at 104.

### E. FIRREA's Impact on Operations

SoCal suffered from higher operating costs as a direct and immediate result of the Government's breach of contract due to the loss of the contract capital. Prior to the breach, SoCal was one of the most well-capitalized firms in the entire 11th District, the California geographic area in which SoCal operated, and against which the thrift compared itself. *See* PX 0316 (Chart Depicting SoCal's Con-

tractual Capital Ratios vs. All 182 California S & Ls). After the breach, SoCal was at the opposite end of the spectrum. As the SoCal Plaintiffs' other expert, Dr. Benjamin Gerard Hartzog, testified, its capital ratio dropped to 1.45%, substantially below its regulatory capital requirement, which placed SoCal in a category of "very, very weak institutions." Tr. 1774–1775. The resulting significant drop in SoCal's regulatory capital affected three main areas: SoCal's retail and wholesale customer base, long-term strategic plans, and cost of acquiring operating capital.

First, the Government's breach affected SoCal's ability to retain and attract retail and institutional customers. Negative media attention in both financial industry publications and mass media affected the public's perception of SoCal. *See* Tr. 1775–1776 (Hartzog). SoCal had to pay higher rates in order to attract deposits from retail customers and institutional customers because of its status as a weak institution. According to SoCal's President Yunker, SoCal had to pay more for the deposits in its branches after the government's breach of contract. *See* Tr. 844. Mr. George Masa, the FDIC's regional director, also acknowledged that capital is a factor in deposit costs and increased capital would assist an institution to keep its deposit costs down. *See* Tr. 2655–2656. SoCal management believed that SoCal's cost of deposits was 15 to 20 basis points higher than its peers due to SoCal's capital deficiency.

In addition, the loss of the contract capital adversely affected SoCal's existing wholesale, brokered, and "money-desk" deposit business. These core areas of SoCal's depositors were more sensitive to changes in interest rates, and thus more likely to abandon a failing institution. Prior to the breach SoCal had a large percentage of wholesale depositors. *See* Tr. 585 (Doyle). Many of these deposits came from SoCal's money-desk operation, which generated deposits primarily from institutional customers, such as credit unions, other savings and loans, smaller banks, and high net worth individuals. *See* Tr. 579 (Doyle).

As a result of the breach and SoCal's demotion to a "troubled" institution, SoCal

could not accept any new brokered deposits or renew existing ones. *See* PX 0377 at 1 (Memorandum from John Yunker to Larry Thrall and Preston Martin: SoCal Strategy, July 18, 1990). The FDIC denied SoCal's application for permission to use brokered deposits as a source of interim funding to implement SoCal's plan to restructure the branch network. It had earlier planned to sell the northern California branches and eventually replace them with additional southern California branches. *See, e.g.,* DX 899 (Memorandum from George Masa, Regional Director to Stanley J. Poling, Director, FDIC Division of Supervision re: Southern California Federal Savings and Loan Assoc. Application for Brokered Deposit Waiver (no date)). Mr. Masa testified that the FDIC considered the risk of this strategy too excessive given SoCal's deficient level of capital. *See* Tr. 2668–2671.

Ultimately, the primary impact of the Government's breach on SoCal's cost of funds was the disruption of its plan to expand and restructure its branch system. This was SoCal's strategic means of achieving its goal of increasing its retail deposit base. Based on his review of OTS correspondence, it is Dr. Hartzog's opinion that absent the breach SoCal would have been able to purchase branches. *See* Tr. 1777–1778. Dr. Horvitz agreed, testifying that the restrictions by the OTS on branch purchases by SoCal were "a particularly egregious example of the kind of restrictions that the OTS directive imposed on SoCal." Tr. 1419–20 (describing the regulators' decision not to permit SoCal to acquire the Santa Paula Savings branches even though it would have been good for both institutions). *See also* PX 0055 (Application to the 11th District of the OTS from SoCal requesting permission to acquire two branch offices of Santa Paula); PX 0059 (Letter from Sidney C. Mar, Assistant District Director, OTS, to John Yunker, Feb. 27, 1990, denying application for permission to the two branches, stating in relevant part: "the original proposal involves an increase in liabilities without a commensurate increase in capital by a capital-deficient institution... such transactions are strictly prohibited for capital-deficient institutions").

Third, we find that the Government's breach and resulting loss of contract capital affected SoCal's costs of acquiring operating capital. The breach caused SoCal to hedge more, which in turn led to higher costs for SoCal's funds. Because SoCal was unable to obtain longer term borrowings in the market after the breach, it used hedging to lengthen the term of its liabilities to make them fixed rather than variable, thereby managing its investment risk, but at a greater cost. *See* Tr. 844–845 (Yunker). Moreover, SoCal was restricted in the type of advances that it was able to obtain from the FHLBank–San Francisco because it was no longer in capital compliance.

After the breach and because of its capital position, SoCal was restricted to short term advances and could not obtain a line of credit or other types of fixed rate longer term advances. The OTS exam reports regularly discussed problems SoCal was having as a result of its high cost of funds. *See, e.g.,* JX 1150 at 19 (OTS Report of Examination, Jan. 21, 1994); JX 1152 at Earnings-2 (OTS Report of Examination, Feb. 9, 1995). As a result of being "undercapitalized," as of May 1995, SoCal's cost of FHLBank–San Francisco borrowings was significantly higher "since the FHLB has only permitted the Association to borrow at the overnight rate rather than the lower cost of the one year rate." *See* PX 0092 at 3 (Letter from Doreen J. Blauschild, SoCal General Counsel to Timothy J. Lane, OTS Assistant Regional Director, May 25, 1995). Furthermore, the loss of capital and downgraded rating limited SoCal's alternative sources of funds, increasing its cost of borrowings under reverse repurchase agreements.

Finally, the evidence proved that SoCal was forced to incur additional expenses during the period right after the breach until 1996 that, absent the breach, it would have not had to pay. For example, while all thrifts must pay OTS filing fees and assessments, FHLBank collateral delivery fees, and SAIF (a Federal insurance fund) premiums, the evidence is uncontroverted that during this period, SoCal's fees, assessments, and premiums were higher because of its deficient capital position and low MA-

CRO/CAMEL rating. In addition, Mr. Yunker testified at length about the fact that SoCal had to retain attorneys and financial consultants to seek advice and assistance in dealing with the regulators and in formulating new business plans to cope with the breach-induced loss of regulatory capital.

## F. Efforts at Compliance with FIRREA

In this complex environment the thrift had only two options in meeting the new capital requirements. Mr. Peter Simon testified that the institution's only alternatives after the breach were either to shrink or add capital. *See* Tr. 1119–20. A third option, to earn its way back into regulatory compliance, was impossible due to the drastic impact FIRREA had on its capital position and the accelerated timetables set forth in the new law and regulations. Accordingly, SoCal chose both alternatives in turn.

### 1. Shrinkage

Because of the required regulatory capital percentages, by "shrinkage," what we mean is that the thrift would dispose of assets, thereby requiring less capital as a percentage of assets. In raw numbers, "each $100 million decline in assets reduces the immediate capital needs by $3 million." PX 0116 at 1 (SoCal's CEO Report, Apr. 23, 1992).

However, because of SoCal's size, it could "not shrink fast enough, or to a size that could effectively function as an institution." Tr. 1119–20 (Simon). Mr. Yunker noted that it was not a realistic possibility for SoCal to shrink to achieve full capital compliance. Mr. Yunker described why shrinkage was undesirable:

> If you shrink to capital compliance... you still have the expenses and the overhead to deal with. In shrinking, you are going to sell off your best assets. Your are going to shrink your gross revenue. You are not going to correspondingly shrink your expenses.... You don't gain a thing by shrinking, other than getting closer to capital compliance. But in the meantime, you're effectively liquidating [or] dismantling the institution. So no, you couldn't

shrink into compliance considering the deficit we had.

Tr. 859–860.

Nevertheless, as with other savings and loans impacted by FIRREA's implementation, the breach caused SoCal to shrink. This was due mainly to the strict growth and operating restrictions. Indeed, while it could not shrink its way into capital compliance (and it would not have wanted to), the impact was felt almost immediately. Agent Mar testified that during the first quarter of 1990, "SoCal shrank by $9 million, although it had projected growth of $10.5 million during the period." Tr. 3626.

The SoCal Plaintiff's expert, Dr. Horvitz, stated that by 1995, SoCal was forced to shrink, and did in fact shrink, to a year-end low of approximately a billion and half dollars. In his words, this shrinkage had "drastic implications for the operation of the institution." Tr. 1433. Specifically, the Institutional Plaintiffs proved that there was a direct correlation between the Government's post-breach regulatory actions and its asset shrinkage. In 1990, immediately before the impact of the breach was felt, SoCal's total net assets were $2.4 billion. By 1993, the assets had shrunk to $1.8 billion. Despite this shrinkage, the core capital ratio stayed under the necessary 3.0%. Accordingly, as we will soon discuss, the thrift was required to raise additional capital to become compliant.

In 1994, the end of the goodwill phase-out period under FIRREA, the thrift again fell out of capital compliance. Accordingly, the Government issued a "Prompt Corrective Action Directive." *See* PX 0072, Apr. 28, 1994. The PCAD implemented immediate mandatory restrictions on the thrift. These restrictions limited management's rights even further than FIRREA and its regulations had with respect to transactions, assets, capital, debt management, staffing, and a number of other areas. Further, the 1994 PCAD forced SoCal to reduce its asset base even further. *See* PX 0297 (Chart With Overview of SoCal's Financial Performance and Condition).

In a May 27, 1994, letter to Timothy Lane, the OTS Assistant Regional Director, Mr. Yunker wrote:

We received the [PCAD] by fax on April 29th.... We are clearly trying to avoid taking a significant loss in order to immediately reduce assets... [O]n an ongoing basis, a reduction of that size [as directed by the PCAD] would adversely impact the core earning potential of the Association. However, subsequent to the receipt of the [PCA] notice, we have begun reducing assets....

PX 0073 at 1.

By 1995, SoCal's net assets totaled only $1.5 billion, a $900 million drop from the days immediately pre-FIRREA, but, capital was still insufficient to meet the regulatory requirements. *See* PX 0343 (Chart Listing Core Capital Ratios, 1987–1997).

It was not until the end of 1996 that assets began to increase and support a compliant core capital ratio of 4.58%. By 1997, assets totaled over $2.2 billion, approximately the same amount as they had been before FIRREA. *Id.* In 1998, SoCal's assets totaled $3.4 billion, and its core capital ratio was 5.38%.

The impact of the breach can also be clearly seen when measuring as a percentage the ratio of net income to assets. *See* PX 0297 (Chart With Overview of SoCal's Financial Performance and Condition). In the mid–1980's, before the Individual Plaintiffs rescued the thrift from receivership, net income to assets was as low as negative 2.95%. In 1987, it was a positive 0.06%; 1989, 0.67%; 1990, 0.60%. Immediately after the breach, the situation reversed itself again, and by 1994, net income to assets was –2.73%. It was not positive again until the end of 1996, when the ratio was +0.75%.

### 2. Capital Raising

#### a. Overview

Despite the asset shrinkage that occurred, it was not enough to bring the institution into compliance with FIRREA. Unfortunately, the nation-wide recession during 1990–1995 was not a propitious time to be entering the capital markets, especially not on behalf of a struggling savings and loan. Messrs. Doumani, Martin, Simon, and Yunker testified unanimously as to how difficult it was to raise private capital at that time. *See* Tr. 246 (Doumani: "there was no money available"); Tr. 454–455 (Martin: it was "very, very, difficult, if not impossible, to raise private capital"); Tr. 1120 (Simon: "From the moment FIRREA was enacted, every board meeting had some very detailed discussion of the plans, the strategy to try to attract capital to our institution, talking to the various investment bankers and sole entities that might be interested in funding directly. There was a difficult environment at that time, and FIRREA made it worse."); and Tr. 849–850 (Yunker: "Savings and loans were viewed in the market as being something that people did not want to invest in, and I was unanimously told that—to forget it, that you couldn't raise capital.").

The Plaintiffs' testimony on this point was confirmed by senior OTS official Eric Shand, who acknowledged that the markets were very conservative at that time, and that it was particularly difficult for thrifts to raise capital. *See* Tr. 4135.

Despite these challenges, the Individual Plaintiffs, with the assistance of SoCal's management, formed a Board of Directors Capital Committee to seek and review various strategic alternatives with respect to SoCal's capital position. From the time of the breach, for nearly two years, however, SoCal was unsuccessful in locating any capital. *See* DX 353 at 2 (Dec. 21, 1990, Yunker letter to the FDIC: "market circumstances have been such that new capital was not and is not available."); DX 369 at 1 (SoCal's CFO Kniffin advising OTS that capital markets had "dried up for institutions in SoCal's reported financial condition," Feb. 27, 1991); and JX0995 at 1 (minutes of Feb. 22, 1991, meeting of SoCal's Capital Committee, where representative of Goldman Sachs told the Board that the "equity market for thrifts and banks has been absolutely moribund.").

Because of these problems, the SoCal Board conferred with a number of investment banking firms, including Merrill Lynch, Lehman Brothers, and as noted, Goldman Sachs. *See* PX0065 (Dec. 4, 1991 letter from William Worthington, Capital Committee Chairman, to Mr. Masa, FDIC Regional Director). Eventually, SoCal retained the firm

of Keefe, Bruyette & Woods, Inc. as its investment banker to assist in capital raising efforts.

The testimony and evidence received at trial established that, as Mr. Peter Simon stated, "FIRREA was the cause of all these recapitalization needs." Tr. 1137. In all, SoCal underwent four different transactions—1992, 1995, 1997, and 1998—to raise capital. The evidence offered by the Institutional and Individual Plaintiffs and their experts is persuasive that the 1992 and 1995 recapitalizations would not have been necessary in the absence of the Government's breach. However, we find that the second two transactions, in 1997 and 1998, were not undertaken as a result of the Government's breach.

At the same time, however, it must be said that the Government's oft-repeated argument that "mismanagement" on the part of SoCal and the Individual Plaintiffs was the "overriding reason" for the recapitalizations is just plain wrong.

First, as we will discuss in a later section, it was the Government's own regulators who repeatedly issued threats of seizure through a myriad of letters, reports, and memoranda in the period after the breach, unless the Plaintiffs infused more capital. *See, e.g.,* Tr. 279–282; 312 (Doumani: "We were told that we better raise [new capital] or [we] would lose the institution" and further discussing the Government's use of the $5 million obligation in the RCMA as a "hammer" against the Plaintiffs). Second, the objective facts—the MACRO/CAMEL ratings—indicate that the thrift's capital position was directly and almost exclusively impacted by FIRREA. Third, quite contrary to "mismanagement," SoCal's Board and staff did an excellent job in such a difficult financial and regulatory environment—and as the Government's reports quoted above indicate, its own regulators thought so at the time. And finally, we accept and indeed endorse Mr. Doyle's testimony that they "worked really hard at [capital raising], because [their] survival was at stake." Tr. 666.

### b. First Recapitalization—1992

In 1992, after a long process of seeking new investors, Messrs. Doumani and Thrall made a successful investment offering to representatives of the Kamehameha Schools Bernice Pauahi Bishop Estate ("Bishop Estate"), a charitable educational trust established under Hawaii Law, and to BIL Securities Limited (BIL), a wholly owned subsidiary of Brierley Investments Limited, a New Zealand corporation. In July and August 1992, SCH issued $48 million in senior debt, and after payment of transaction fees and expenses, contributed $43.5 million of the net proceeds to SoCal. The result of this transaction brought SoCal into capital compliance, but just barely.

In addition to the Bishop Estate and BIL, Arbur, Inc., the Simon family trust controlled by Secretary Simon for the benefit of his children, participated in the 1992 recapitalization, 62.5% of the debt was purchased by the Bishop Estate, 31.25% was purchased by BIL, and Arbur acquired the remaining 6.25%.

However, as discussed by Mr. Doumani, the new capital providers were not content to lend SoCal money just for interest payments. Instead, they demanded an equity ownership position. *See* Tr. 245 ("This was an equity play here, and I knew of no sources that would lend us the money without an equity play."). Accordingly, SCH also issued 92,344 shares of a newly-created Class A common stock in the same percentages to the Bishop Estate, BIL, and Arbur, for one cent per share.

The original common stock, which had no class designation prior to the 1992 transaction, was converted to Class B common stock. The preference on liquidation or sale was the preferred shareholders first, followed by payment of the senior debt, followed by payment of all SCH expenses, with the balance to be split by the common stock holders. While the number of new common shares was calculated to give the three new investors 36% of the voting rights and of the total profits upon sale, the total Class A common stock amounted to 48.64% of the total common stock of SCH.

As a result, therefore, the original common stock held by the Individual Plaintiffs was worth much less than it had been after the 1987 contract. Whereas the Individual Plaintiffs had once owned 100% of the common stock, their total ownership interest had been diluted to 51.36%. *See* PX 1202A (Common Stock Investors in SoCal Holdings Following 1992 Recapitalization). We find that this restructuring was an absolute necessity; without it, SCH would never have been able to raise funds from the new investors. Furthermore, the Government's main concern, as expressed by the regulators and as incorporated in the RCMA to have active participation by the Individual Plaintiffs, was maintained by keeping effective institutional control, but just barely, in the hands of the original contract signatories. Following the consummation of this transaction, the OTS terminated the RCMA. *See* JX 1506 (Conditional Termination of the RCMA, Irrevocable Proxy and Dividend Limitation Stipulation, June 30, 1992).

To infuse the cash directly into SoCal, SCH purchased 435,000 shares of "Series B Non–Cumulative Perpetual Preferred Stock." That stock was senior to the original preferred stock of SoCal, which was owned by Memvale, FIMA, and SCH after the 1987 contract was signed. Since it was non-cumulative and perpetual, it was permitted to count as core capital for regulatory reporting purposes. *See* PX 0036 (Oct. 19, 1992, Memorandum from Jeff Kniffin to Files re: 1992 Capital Restructuring).

This FIRREA-induced recapitalization had additional costs. First, the SoCal Plaintiffs paid $5.218 million in transaction costs. Second, the notes that were issued were very expensive, in terms of the interest rate on the notes. During years 1–8, the notes bore interest at 15% per annum; in year 9, 17%; and in year 10, 19%, all payable in quarterly installments. SoCal attempted to pay less interest, "but there wasn't capital available" that would take less than that. *See* Tr. 975 (Yunker). The Government regulators recognized at the time of 1992 recapitalization that it was expensive, but necessary. Agent Mar testified that the "high yield promised to preferred stockholders [and the] high costs

of debt" was an additional cost of the capital raised. Tr. 3675–76. And in an October 1993 report George Masa, another of the regulators, wrote that:

> "SoCal's capital position was markedly improved with a $42.2 million recapitalization in August, 1992.... [SCH] financed the capital injection through issuing high cost subordinated debt (written at 15 percent and escalating to 19 percent) to non-Simon investors. Dividend payments from SoCal are the holding company's sole source of income. From 1993 to 1997, debt service will run $6 million/annually."

DX 594 (Memorandum from Mr. Masa to Mr. Stone, Oct. 23, 1993).

Despite over $5 million in transaction costs and required interest payments of over $500,000, and the costs of diluted ownership borne by the Individual Plaintiffs, the recapitalization worked—for a time. *See* PX 0042 (Jan. 26, 1993, Update Memo to Files from Jeff Kniffin); PX 0282 (Cost of 1992 Senior Notes). Immediately after this transaction, on November 16, 1992, SoCal's CAMEL rating was a 3, and its core capital ratio was over 3% for the first time since the breach. And while the thrift was capital compliant with the current requirements immediately following the 1992 capital infusion, FIRREA imposed increasingly stringent capital requirements as the Act went fully into effect, and the thrift had to meet these requirements. Thus, it remained a 3 for only one year—by November 1993, it was again rated a 4.

#### c. Second Recapitalization—1995

The harmful effects of the breach continued to build from 1992 to 1995. Notwithstanding the over $43 million in new capital that was infused in 1992, SoCal's capital position was not sufficient to absorb the significant credit losses which continued to mount. In 1995, a second recapitalization became necessary.

The Court heard considerable testimony about the effects of the recession in California, the worst since the Great Depression; about the massive decline in real estate values; and about the losses which stemmed from the riots in Los Angeles following the

Rodney King trial and Northridge earthquake in 1994. Nonetheless, we find that FIRREA was the principal cause of this additional round of capital raising. As Mr. Yunker stated, while the 1992 capital raise "just barely" "filled the hole," the regulators "still wanted additional capital." Tr. 855, 861. Interestingly, as noted in PX 0088, an April 7, 1995, letter (prior to the 1995 recapitalization) from SoCal to the OTS, "If SoCal was permitted to include [the qualifying supervisory goodwill booked in 1987] ... as of March 31, 1995, it would be deemed well-capitalized as of that date."

As discussed above, SoCal received the April 1994 Prompt Corrective Action Directive, and was specifically told that it would "not survive without an immediate and substantial capital infusion." JX 1168 (the 1994 year-end FDIC Report of Examination, Nov. 28, 1994, which indicated that absent new capital, "closure ... is anticipated"). By the end of 1994, the end of the supervisory goodwill and capital credit phase-out period, the thrift had again fallen out of regulatory capital compliance. See PX 0264 (Letter from John Yunker to Timothy Lane, Jan. 27, 1995, stating that the final regulatory phaseout of goodwill rendered SoCal "critically undercapitalized").

Thereafter, the OTS placed SoCal in the Accelerated Resolution Program of the Resolution Trust Corporation (RTC) (created by FIRREA to dissolve failing thrifts and liquidate their assets and assume their liabilities). See PX 0084 (Agreement between SoCal and OTS). In a final sign of SoCal's imminent potential for failure and seizure, in November 1994, it was assigned a composite rating of 5. See PX 3148 (OTS Letter to SoCal Board of Directors).

As in the first recapitalization, the Individual Plaintiffs, together with the Board and management, actively sought additional investors and capital. The capital markets in 1995 were as tight as they were in the 1990–1992 period after FIRREA. Accordingly, the Board of Directors, with the Government's concurrence, turned again to the 1992 capital providers for additional funds. See JX 1168 (FDIC's 1994 year-end report which noted how difficult it was for SCH to raise capital, stating that the 1992 capital providers "constitute the only potential source of additional funds at this time.").

In June of 1995, SCH raised $60.5 million in capital by issuing debt and equity. The capital providers, however, would only agree to invest additional cash into SoCal if the Individual Plaintiffs' remaining ownership interest were extinguished, and if the Board brought in new management. See JX 24 (SoCal 1995 Annual Report); Tr. 245–47 (Doumani: "those were the terms. At that particular time, there was no money available..." other than going to the 1992 capital providers). In the view of Mr. Peter Simon, no other form of capital was available—the only source of funds was the entities that had participated in 1992. See Tr. 1135. The testimony and evidence of the other Individual Plaintiffs, SoCal management, and significantly, of the Government's regulators, support Mr. Simon's conclusion and we agree.

Further, in connection with, and as a prerequisite to the 1995 recapitalization, the Individual Plaintiffs' shares of SCH common stock purchased in the 1987 acquisition transaction were cancelled for no consideration. This demand, and SCH's acquiescence to it, was specifically reported to and approved by the Government:

> The shareholders of SCH have been advised by Bishop, Brierley and Arbur that they are willing to invest the funds in SCH necessary to recapitalize the association if and only if a plan of reorganization in substantially the following form is implemented.... [T]he outstanding shares of SCH Class B Common shall be cancelled without consideration.

See JX 1607 (Letter from SoCal General Counsel Doreen Blauschild to Timothy Lane at OTS, transmitting SCH corporate resolutions adopting the June 1, 1995, Plan of Reorganization); see also JX 1619 (1995 Recapitalization Closing Memorandum); JX 1620 (Agreement and Plan of Reorganization); JX 1599 (Letter from Gerald L. Hawkins, attorney for SCH, to John F. Robinson, OTS Regional Director, Apr. 20, 1995, confirming the Government's approval of the recapitalization).

Each Plaintiff's witness and several regulators testified that the management team from 1989–1995 had done an excellent job, and were, in the words of one of the Individual Plaintiffs "very strong" and "very competent." Tr. 1138 (Simon). However, the management transition required as a part of the 1995 recapitalization occurred in March 1995. SoCal replaced its former senior managers, including Messrs. Doyle and Yunker, with a new management team with considerable experience in commercial banking and problem asset resolution. The new management team included Rudolph P. Guenzel as President and CEO, and J. Michael Holmes as Executive Vice President and Chief Financial Officer. It was important to have leaders with experience in this area because of SoCal's new business plan to transition the thrift to commercial bank-type operations.

Mr. Holmes testified that the crux of the new management team's strategic plan was the infusion of additional capital. *See* Tr. 1235. Accordingly, the second recapitalization was executed in June 1995. In this transaction, the 1992 capital providers were again the sole participating entities. The Senior Notes issued in 1992 were returned to SCH and contributed to the capital of SoCal. In addition, the Bishop Estate and BIL purchased $10 million in new debt, bearing an initial interest rate of 7% per annum, increasing in increments to 10.75% and eventually to 11.15% per annum. SCH also issued a $2 million Senior Note to Arbur.

In equity, as noted, SCH cancelled for no consideration the shares held by the original contract signatories, the Individual Plaintiffs. Various outstanding series of the preferred stock issued in 1987 were redeemed (that held by Memvale and FIMA), and the preferred stock issued in 1992 was exchanged for Common Stock. SCH also issued 85,000 of Series C Preferred Stock, 68,000 in Series D Preferred Stock, and 332,000 in Series E Preferred Stock. Each of these Series required quarterly dividend payments of $2.95, $3.00, and $3.00 per share, respectively. For the equity, SCH received $48.5 million.

As a result of this transaction, SCH infused $60.4 million of capital directly into SoCal. The SoCal Plaintiffs incurred over $700,000 in transaction costs from raising this capital, and were required over the next several years to make dividend and interest payments of over $22 million on the equity and debt issued in 1995. *See* PX 0283 (Cost of 1995 Senior Notes); PX 0284 (SoCal Plaintiffs' 1995 Recapitalization Expenses).

The remaining common shareholders in SCH following the 1995 recapitalization were the Bishop Estate, with 60% of the shares; BIL, with 30% of the shares; and Arbur, with 10% of the shares. Messrs. Doumani, Martin, Simon, and Thrall were each left with nothing, and, similarly, all of Arbur's original 1987 investment was cancelled. The Individual Plaintiffs and their experts refer to this 1995 transaction as "dilution-to-zero." It is more properly called "extinguishment."

By August 1995, shortly after this transaction, SoCal was raised to a composite 4 rating. Throughout two subsequent examinations, a regular one in February–March 1996, and a SoCal-requested special exam in September 1996, the OTS continued to give the institution a CAMEL composite rating of 4. *See* JX 1153 (OTS Report of Examination, April 12, 1996); JX 1155 (Memorandum from Richard Kuczek, Regional Examiner to Timothy Lane, Sept. 25, 1996). Despite the recent infusion of over $60 million, and despite pleas during both examinations by SoCal's management, the regulators specifically declined to upgrade SoCal's rating.

However, the situation changed during its next regular examination, which concluded in April 1997, and evaluated SoCal as of December 31, 1996. After that review, the examiner concluded:

> After the recapitalization of SoCal in June 1995 and installation of new management, the Bank set on a course of improving earnings, capital, and asset quality. The primary steps were control of general and administrative (G & A) expenses and the disposal of problem assets.... These accomplishments contributed to the Banks' positive 1996 earnings, the first year of positive earnings for the Bank since 1992.

JX 1157 (OTS Report of Examination, April 29, 1997).

The OTS scored SoCal a 3 in every CAMEL category (capital adequacy, asset quality, management, earnings, liquidity) and a 4 in sensitivity to market risk. Overall, though SoCal was rated a 3. We conclude that at this time, as of December 31, 1996, the institution was restored to a healthy capital position, recovering the "3" it had on the eve of FIRREA's passage. The effects of the Government's breach had thus been mitigated by the considerable efforts of the institutional and Individual Plaintiffs and, of course, by the infusion of approximately $100 million in tangible capital. SoCal was finally out of the very deep hole it had been in for years.

### d. Two More Transactions—1997 & 1998

The Institutional Plaintiffs also claim damages arising out of the third and fourth transactions to infuse additional capital into SoCal. They assert that OTS continued to pressure SoCal even after the 1995 recapitalization to raise yet more capital. *See* JX 1153 (OTS Report of Examination, April 12, 1996, where OTS notes that it encouraged the Board to attain "well capitalized"—CAMEL 1 or 2—status). This may well be the case. However, we find that the transactions that SoCal undertook following its return to a composite 3 rating in early 1997 were independent business decisions that were not undertaken to replace the capital lost as a result of the breach.

To be sure, the 1997 and 1998 transactions were "capitalizations"—in that they both resulted in additional capital for the thrift. But the Court declines to find that they were "recapitalizations" necessary to replace the contractual capital lost as a result of FIRREA.

With the arrival of the new management team, SoCal retained the investment banking firm Sandler O'Neil & Partners. Thereafter, in 1997, SoCal formed People's Preferred Capital Corporation (PPCC), a real estate investment trust (REIT). PPCC, in turn, issued 1.4 million shares of Noncumulative Exchangeable Preferred Stock bearing a 9.75% dividend, with a liquidation preference of $25.00 per share. *See* PX 0140 (PPCC Prospectus, Sept. 30, 1997). This REIT transaction raised $35.65 million in gross proceeds, $33.25 million of which was contributed upstream to SoCal and counted as regulatory capital. SoCal paid $2.4 million in transaction costs, and PPCC paid $14.7 million in dividends on the preferred stock it issued. *See* PX 0308 (Cost of 1997 REIT Transaction).

One year later, SCH (now called PBOC Holdings, Inc.) conducted an Initial Public Offering (IPO) of the common stock of SCH. *See* PX 0141/JX 1804 (PBOC Holdings, Inc. Prospectus, May 12, 1998). In connection with the IPO, SCH paid all accumulated dividends on its previously issued and outstanding Series C, D, and E Preferred Stock. Further, it also redeemed this preferred stock in exchange for 8.5 million shares of SCH common stock. In doing so, it incurred a cost of $68.753 million, representing the cost of conversion (the value of 8.5 million common shares times the $13.75 price per share, less the $48.5 million face value of the preferred stock). *See* PX 0287 (Cost Notebook/Exhibit E: 1998 Recapitalization). The IPO cost SCH $10.593 million in transaction costs. *See* PX 0309 (Costs of 1998 Recapitalization). The company's common stock was approved for quotation on the Nasdaq National Market and was listed under the symbol PBOC.

The IPO was priced at $13.75 per share of common stock. It is significant to note that the allotment was comprised of shares offered by both the holding company and the existing common stock holders (at that time, Bishop, BIL, Arbur). The net proceeds for SCH totaled approximately $129 million, of which approximately $88 million was infused into SoCal as paid-in capital. *See* PX 0391 (Memorandum from J. Michael Holmes to George Limm, OTS Examiner, July 8, 1998).

In that 1998 memorandum, Mr. Holmes noted that the IPO had three objectives: first, to "clean up" the capital of the holding company by "eliminating high-cost senior debt and cumulative preferred stock"; second, to raise additional capital to support growth; and third, to increase SoCal's regulatory capital ratios. *Id.* While the Court appreciates and understands SoCal continued need to expand its capital position, we do not

find that the breach was the substantial factor in causing either the 1997 or the 1998 transactions.

One final note: in April 2001, the Institutional Plaintiffs announced that they had entered into an agreement with FBOP Corporation (FBOP), a savings and loan holding company incorporated in Illinois. The merger was consummated in November 2001, and provided for the conversion of each share of SCH common stock into the right to receive $10.00 per share. FBOP is an $11 billion multi-state holding company and the parent company of California National Bank (CNB). The successor-in-interest to SoCal, CNB has 59 branch locations in California and assets of over $6 billion. *See* www.fbopcorporation.com/about_us.html.

### G. Additional Findings with Respect to the Individual Plaintiffs

#### 1. Simon/Arbur Relationship

Though the Simon Plaintiffs—Arbur and now the Estate of William E. Simon, Sr.— have two identities, we find that throughout their relationship with the Government, and in their operation and management of SoCal, they were in reality one entity controlled by Secretary Simon until his death. This subsection discusses several additional facts specific to the Simon Plaintiffs.

Mr. Peter Simon testified that his father sold his shares of common stock in SCH to Arbur on October 4, 1989 for the "nominal amount" of $19,400, or $1 per share. Tr. 1140; *see also* DX 260 (Stock Purchase Agreement between Arbur, Inc. and William E. Simon, Sr., Oct. 4, 1989). Arbur, as we have said, is a closely held family corporation, owned solely by members of the Simon family, and organized for the benefit of Secretary Simon's children. Mr. Peter Simon characterized this transfer as "pure and simple estate planning" done without regard to SCH, SoCal, or even FIRREA. Tr. 1140. At the time, the elder Simon had the controlling vote in Arbur, but a very small percentage of its overall ownership. Many of Secretary Simon's other personal and marital holdings were also transferred to either Ar-

bur or to the Simons' charitable foundation as well. *Id.*

Mr. Tomas E. Randlett, a certified public accountant and one of the experts called upon by the Government to testify about cash flow accounting at SCH and SoCal, believes that for purposes of assessing both cash flow and the damages suffered by the Simon Plaintiffs, it is appropriate to view Secretary Simon's interests together with Arbur's. *See* Tr. at 3922–3923. Clearly, the transfer of Mr. Simon's interest to Arbur did not dilute the Simon Plaintiffs' collective interest.

The evidence clearly established that Mr. Simon's transfer of his individual ownership interest to himself and his children as the sole owners of Arbur represented a change in form, not substance. Moreover, despite the Government's attempt to characterize the transfer as "arm's length," it was not. *See* DX 259 (Memorandum from William E. Simon, Jr. to William E. Simon, Sr. re: Sale of SoCal Holdings, Inc. Common Stock to Arbur, Oct. 3, 1989). We agree with the Simon Plaintiffs' characterization of this transaction as a transfer done for estate planning purposes. Accordingly, the Court will analyze the economic harm to Secretary Simon caused by the Government's breach, and the damages necessary to redress that harm, together with the harm and damages for Arbur.

After 1989, and before 1995, Mr. Peter Simon stated that there was no further transfer of these shares, and no additional compensation was received for these shares. *See* Tr. 1140. The entire 29,000 shares acquired by the Simon Plaintiffs in 1987 were cancelled for no consideration in the 1995 recapitalization. Neither Secretary Simon nor his Estate have ever received a penny for the loss of those shares.

Arbur, as we have said, participated in the first two recapitalizations. It gave new consideration for the newly issued SCH shares in both 1992 and 1995. In 1992 the Simon Plaintiffs invested $2.88 million in an SCH senior note. *See* PX 1205A (Simon Plaintiffs' Investments in SoCal Holdings). Also in connection with their participation in the 1992 recapitalization, the Simon Plaintiffs re-

ceived 5, 771 SCH Class A common shares, which were issued at one cent per share. *See* PX 1202A (Common Stock Investors in SoCal Holdings Following 1992 Recapitalization); JX 1526 (Stockholders' Agreement Among SCH, the Common Shareholders, Bishop, BIL Far East and Memvale, July 28, 1992).

In 1995, the Simon Plaintiffs again assisted SCH with its mitigation efforts by participating in the second recapitalization. In that transaction, the Simon Plaintiffs invested $4 million in SCH series D preferred stock and invested another $1.92 million in an SCH senior note (pursuant to a contractual commitment made during the 1992 recapitalization). *See* PX 1205A (Simon Plaintiffs' investments in SoCal Holdings); JX 1619 (Closing Memorandum, June 1, 1995).

Mr. Peter Simon persuasively testified that the Simon family, through Arbur, participated in the 1992 and 1995 recapitalizations "for confidence's sake." Tr. 1135–36. He contended that the Simon family, as an existing investor, was compelled to purchase additional shares in SCH to entice new investors who otherwise would not have participated in these offerings without the imprimatur of an existing owner's (who also happened to be a former Secretary of the Treasury) continued confidence in SoCal's future. *Id.*

Arbur sold its new SCH securities, unrelated to the Simon Plaintiffs' initial investment interest, in the 1998 IPO and 2001 merger. As part of the IPO, the Simon Plaintiffs received a $1.6 million preferred dividend and sold a portion of their SCH stock—all of which was acquired after the Government breached its contract—for which they received approximately $4.9 million. *See* JX 1796 (Correspondence Re: Payment of Dividends and Proceeds of Sale of Stock to Selling Stockholders). Following the IPO, the Simon Plaintiffs retained ownership of additional shares of SCH common equity. *See* DX 867 (Letter from J. Michael Holmes to Mark Butler re: IPO Over–Allotment Settlement, May 19, 1998).

As part of the merger with FBOP Corporation, the Simon Plaintiffs surrendered their remaining SCH shares and received proceeds—all of which were traceable to the 1992 and 1995 SCH investments—in the approximate amount of $6.4 million. *See* PX 1205A (Simon Plaintiffs' Investments in SoCal Holdings).

The Simon Plaintiffs could not and did not sell the shares it acquired pursuant to the 1987 contract with the Government because those shares were cancelled without consideration in 1995 as a direct consequence of the Government's breach. We find that any benefit that accrued to Arbur upon disposition of those new securities in no way compensated the Simon Plaintiffs for elimination of their pre-breach, contractual interests.

## 2. Individual Plaintiffs "Divorce" from Ariadne

In 1990, the Individual Plaintiffs and the Ariadne entities went through "a very complex divorce, a financial divorce with Ariadne. . . ." Tr. at 1142 (Simon). *See* DX 305 (Letter from Madeleine A. Kleiner of Gibson, Dunn and Crutcher to Ed McManus of OTS summarizing the principal elements and components of the financial divorce between the Simon interests and Ariadne, May 15, 1990).

Aspects of the 1990 "divorce" between the Individual Plaintiffs and Ariadne included, among other things, (a) payment of $32 million from the Simon family to Ariadne, (b) transfer of certain real estate interests, (c) exchange of mutual releases, (c) increase in the loan to the Individual Plaintiffs to purchase and hold SCH stock from $5.8 million to $30 million and conversion from recourse to non-recourse, (d) a new $6 million loan from the Simon family to Ariadne, (e) pledge of the SoCal note by Ariadne to the Simon family to secure the $6 million Ariadne note, and (f) other terms. *See, generally,* Tr. 1142–1154 (Simon); DX 59 (Letter from Gerald Parsky to David Crawford of Peat Marwick Hungerfords in care of Ariadne Australia Limited, Dec. 16, 1987); DX 63 (Letter from Gerald Parsky to Anthony Thomas, Ariadne Australia Ltd., Jan. 8, 1988); DX 88 (Letter from Gerald Parsky to Eugene Cafiero, KDI Corp., Mar. 31, 1988); JX 1543 (Amended and Restated Promissory Notes from each of the Common Shareholders in favor of Memvale, July 6, 1990).

The 1990 restructuring had little, if anything, to do with SoCal or the economics of that transaction and was admittedly not caused by the Government's breach. *See* Tr. 1178–1179 (Mr. Simon testifies that the financial divorce with Ariadne was unrelated to SoCal or the Government's breach). As we discuss later, the Government's argument that the Individual Plaintiffs suffered no harm as a result of the restructuring of their loans from Ariadne has no merit.

### 3. Thrall/Arbur Relationship

Mrs. Beverly Thrall testified that she and her husband, Larry Thrall, were in a very bad financial condition in the early 1990's. *See* Tr. 489. As noted, Mr. Thrall had borrowed extensively to invest with the Simon family in several other thrifts. When FIRREA caused a precipitous decline in the value of his banking investments, the Thrall's personal financial condition was negatively impacted.

Accordingly, on October 16, 1992, Mr. and Mrs. Thrall executed an omnibus Transfer Agreement with Secretary Simon. *See* PX 3131 (Transfer Agreement by and between Larry B. Thrall and William E. Simon, Sept. 30 and Oct. 16, 1992). In the 1992 Transfer Agreement, the Thralls settled their debts by transferring their holdings in the various savings and loans to various entities to whom they owed money. *Id.* Their 14,000 shares in SCH (at this time, they were already impaired by the breach and diluted by the first recapitalization) were transferred to Arbur.

We find that this transfer would not have been necessary but for the Government's breach. As Mr. Thrall's co-Plaintiff and business partner, Roy Doumani stated:

> [T]here would not have been a need [for Mr. Thrall to transfer his shares to Mr. Simon], because the asset and the coverage that that asset gave for the money that had been borrowed from Mr. Simon by Larry was more than adequately covered [before the breach].

Tr. 240–41.

And yet, despite the transfer, Mr. Thrall did not walk away from SoCal. Mrs. Thrall's testimony made it clear that Mr. Thrall was committed to SoCal, and to honoring his commitment to the Government in the RCMA.

> Larry was very much vested in [SoCal's] future and its success. After the breach he was horrified and dismayed ... He just kept saying, this is just a disaster. How could they do this? I mean, don't they realize what they have done? [He] became almost obsessed with trying to figure out how can they make this work, even though the contract had been breached... [H]e was working day and night, honestly, trying to work that out.... And ultimately, he became very depressed, and his health suffered.... [I]t really was a horrible problem for him.

Tr. 479–81.

The undisputed testimony of SoCal's senior managers, and of the regulators, was that Mr. Thrall was one of the leaders in seeing to it that SoCal was adequately recapitalized after FIRREA. *See* Tr. 217 (Doumani); Tr. 985 (Yunker); *see also* JX 0308 (Minutes of SoCal Board of Directors Meeting, Sept. 25, 1990). SoCal President Yunker stated:

> Larry Thrall ... was taking the lead, for the most part, relative to the shareholder efforts [to raise capital].... [Mr. Thrall] was under an incredible amount of pressure to assist in the raising of capital, and Larry felt personally responsible for the fact that the deal wasn't working out.

Tr. 852, 988.

In sum, the evidence is clear that like his partners, Mr. Thrall was committed to SoCal and he would not have transferred his interest if it had not been absolutely necessary in the wake of FIRREA.

### IV. *Damages Standards*

*Winstar* damage claims have been the subject of many recent opinions. The judges of this Court and of the Federal Circuit have encountered the various *Winstar* plaintiffs' damages theories, and the Government's defenses to them, several times. We summarize our understanding of the guidelines expressed in the Federal Circuit's opinions in the following cases: *Glendale Fed. Bank v. United States,* 239 F.3d 1374 (Fed.Cir.2001);

*California Fed. Bank v. United States,* 245 F.3d 1342 (Fed.Cir.2001); *Bluebonnet Sav. Bank v. United States,* 266 F.3d 1348 (Fed. Cir.2001); and *LaSalle Talman Bank v. United States,* 317 F.3d 1363 (Fed.Cir.2003). Each of the damage claims before us was before the Federal Circuit Court in one or more of those cases. Accordingly, we turn to them as our analytical starting point.

## A. Expectancy Standards

■ There are three general categories of contract damages—expectancy, restitutionary, and reliance damages. As the Federal Circuit has noted, "one way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred." *Glendale,* 239 F.3d at 1380 (citing Restatement (Second) of Contracts § 344(a)). These expected benefits are "often equated with lost profits," though they "can include other damage elements as well." *Id.* Lost profits are a "just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement. . . if the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment." *Energy Capital Corp. v. United States,* 302 F.3d 1314, 1328 (Fed.Cir.2002) (quoting *Wells Fargo Bank v. United States,* 88 F.3d 1012, 1022–1023 (Fed.Cir.1996)).

■ In terms of proof, the Circuit has stated that "[e]xpectation damages are recoverable provided they are actually foreseen or reasonably foreseeable, are caused by the breach of the promisor, and are proved with reasonable certainty." *Bluebonnet,* 266 F.3d at 1355 (citing Restatement (Second) of Contracts §§ 347–351). The Federal Circuit has further held that the standard for causation is that the breach must be a "substantial factor" in the damages, not the "but for" cause of the plaintiff's harm. *Id.* at 1356.

There are two important observations when it comes to *Winstar* expectation damages. First, we learned from the *CalFed* opinion that "[b]oth the existence of lost profits and their quantum are factual matters that should not be decided on summary judgment if material facts are in dispute." 245 F.3d at 1350. Thus, in that case, the Federal

Circuit directed the U.S. Court of Federal Claims to hold a trial to find the facts relative to those claims. Second, to date, no trial court has awarded lost profits in a *Winstar*-related case, at least not to an open bank or holding company. In the *Glendale, LaSalle Talman,* and *California Federal* cases, the trial courts held that the plaintiffs did not meet their burden of proof for lost profits. For much the same reasons we come to the same conclusion in this case.

## B. Restitution Standards

■ A second category of contract damages is restitutionary relief. According to the Restatement, restitution is the plaintiff's "interest in having restored to him any benefit that he has conferred on the other party." Restatement (Second) of Contracts § 344(c). One measure of restitution is the "value of the benefits received by the defendant due to the plaintiff's performance." *Landmark Land Co. v. United States,* 256 F.3d 1365, 1372 (Fed.Cir.2001). In other words, restitution is a remedy that sounds in disgorgement—it takes from the breaching party the benefits conferred on him, and it returns the "non-breaching to the position it would have been had there never been a contract to breach." *Glendale,* 239 F.3d at 1380.

In the *Winstar* context, thrifts seeking restitution (as opposed to investor-signatories) are seeking the cost savings to the FSLIC for not having to liquidate the acquired institution. To do so, the thrift plaintiffs seek the estimated amount of liquidation costs (generally, there are two estimates—a plaintiff's estimate and the original Government estimate from the time the contract was signed) less any FSLIC cash assistance or FSLIC indemnification payments. This is said to be the amount of the Government's benefit it should not keep in light of the later breach.

At the conclusion of the first *Winstar* damages trial, then-Chief Judge Smith awarded the *Glendale* plaintiffs "restitutionary" damages, calculated in terms of the liabilities of the troubled thrift that were assumed by the plaintiff in the supervisory acquisition. 43 Fed.Cl. 390 (1999). The theory was based on

an argument that the Government did not have to assume those liabilities, or pay that amount, from the insurance fund upon the hypothetical future liquidation of the thrift. The Federal Circuit, however, overturned that award. While it noted that promises in *Winstar*-related contracts have "substantial value," it stated that:

> the action taken by the purchasing S & L in acquiring the failing thrift did not result in the Government, specifically the FSLIC, saving the dollar value of the net obligations of the thrift.

> In a very real sense, what the Government received in exchange for its promise was time—time to deal with other failing S & Ls, time to see what the market would do before having to commit substantial resources to the problem.

> It is important to remember that, even after [the merger], the Government was not free of potential liability for the failing thrift. Had interest rates not come down... [and the thrift failed], the Government's contingent liability would have matured.

*Glendale*, 239 F.3d at 1382.

Thus, the Federal Circuit held that damages could not be measured in terms of a "liability that never came to pass, and based on a speculative assessment of what might have been...." *Id.* The Institutional Plaintiffs' restitutionary claim as measured by the cost savings to the FSLIC is similarly defective.

### C. Money–Back Restitution Standards

Another measure of restitution damages in the *Winstar* context applies to the plaintiffs who are individual contract signatories. These plaintiffs participated as individuals in the transactions, were parties to the various instruments that formed the binding contract, and are shareholders of either the thrift or its holding company. As independent parties to the contract, they are entitled to damages for harm they suffered by the Government's breach of promises to them and independent of harms suffered by other parties to the contract.

Awarding damages to these plaintiffs requires a case-by-case analysis of the pre-and-post breach events and how they affected their individual interests. In general, however, several courts have held that they are, at a minimum, entitled to "money-back" restitution for their initial investment in the thrift. *See Mobil Oil*, 530 U.S. at 608, 120 S.Ct. 2423; *Hansen Bancorp*, 53 Fed.Cl. at 100 (2002). On the other hand, the individual shareholders may be limited in their ability to claim such things as dimunition, or expectancy, damages. *See LaVan v. United States*, 56 Fed.Cl. 580 (2003).

If the trial court finds that the harm and injury to the individual plaintiffs is "separate and distinct" from the harm to the institution, the court may award damages over and above the simple award of money-back restitution. *See LaSalle Talman Bank v. United States*, 45 Fed.Cl. 64, 73 (1999); *Strougo v. Bassini*, 282 F.3d 162, 172–75 (2d Cir.2002); 12B Fletcher Cyclopedia of the Law on Corporations § 5913 (2000). Accordingly, in specific application, the Federal Circuit has held that an individual investor plaintiff is entitled to compensation "based on the profits [he] relinquished" when a breach-induced recapitalization forces him to "give up a significant equity stake." *Bluebonnet*, 266 F.3d at 1356.

Determining that compensation is a matter for the trial court, and where the fact of damage is proven, "it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision." *Id.* at 1355. We take this approach with respect to the Individual Plaintiffs, and we note at the outset that their damages claim does permit the Court to award damages based on a concrete number, and not upon a hypothetical theory or construct.

### D. Reliance Standards

■ A third category of damages is known as reliance damages. The principle of reliance damages is that a party who relies on another party's promise made binding through a contract is entitled to damages for any losses actually sustained as a result of the breach of that promise. *See Glendale*, 239 F.3d at 1382–83. "The reliance recovery

is a reimbursement for losses the plaintiff suffers in reliance on the defendant's contractual promise." *3* DAN B. DOBBS, LAW OF REMEDIES *§ 12.3(1) (2d ed.1993)*. As a general matter, reliance damages are available for costs incurred both before and after the breach.

In the *Winstar* context, the plaintiffs typically seek three types of reliance damages, two of which have been generally accepted to date by the Federal Circuit. Because the term "reliance" is so broad, for the purposes of the trial in this case, the Court adopted the generally-agreed upon *Winstar* nomenclature for these three areas of damages— "Wounded Bank" Damages, Replacement of Lost Capital, and Assumption of Liabilities.

The first type of reliance damages are so-called *"Wounded Bank"* damages. "Wounded bank" damages are costs incurred by the thrift because of its status as a "troubled" or under-capitalized institution—a status directly related to FIRREA's mandated removal of goodwill from the thrift's regulatory capital. *Winstar* plaintiffs claim as "wounded bank" damages the following types of costs—higher costs of funds, higher insurance and regulatory premiums and assessments, and extra attorney and consultant fees to interface with the regulators.

The trial court in *Glendale* awarded "wounded bank" damages. On appeal, the Federal Circuit did not review the underlying data on the individual areas, but after reviewing and noting the specific damages, stated:

> [W]e conclude that, for purposes of measuring the losses sustained by Glendale as a result of the Government's breach, reliance damages provide a firmer and more rational basis than the alternative theories argued by the parties.

*Glendale*, 239 F.3d at 1383.

We found that also to be the case in this trial.

The second type of reliance damages for thrift plaintiffs is the *Cost of Replacement Capital*. In a *Winstar* context, this is the damage theory that is the easiest to understand, and easiest to quantify. Simply stated, it is the amount of money spent by the thrift to replace the goodwill lost as a result of the government's breach. This can include transaction costs and related capital-raising expenses. Because contract law precludes recovery for speculative damages, this category of damages has been repeatedly adopted by the trial judges, and endorsed by the Federal Circuit. *See, e.g., Bluebonnet*, 266 F.3d at 1356 ("The Court of Federal Claims properly determined that the breach of the forbearances was a substantial factor in Blunebonnet's increased financing costs because it forced Bluebonnet to raise capital when FIRREA had made investments in thrifts riskier and considerably less attractive."). We do so here, as well.

In *LaSalle Talman*, the plaintiffs sought the cost of replacement capital. While the trial court rejected the specific costs claimed based on a hypothetical construct which was also later rejected by the Federal Circuit, Judge Bruggink stated the following:

> [T]he cost of replacement capital can serve as a valid theory for measuring ... damages in the *Winstar* context because it provides a measure of compensation based on the cost of substituting real capital for the intangible capital held plaintiff in the form of supervisory goodwill.

45 Fed.Cl. 64, 87 (1999).

In response, the Federal Circuit concluded "we agree with these statements of principle...." 317 F.3d at 1374.

In a similar case that went to trial on this type of damages claim, Judge Hodges also explained the rationale behind the "cost of replacement capital theory:"

> The Government's breach resulted in the elimination of CalFed's supervisory goodwill. CalFed is entitled to what it would cost to replace that goodwill in the capital market.

43 Fed.Cl. 445, 460 (1999).

Accordingly, Judge Hodges awarded the CalFed plaintiffs their claimed transaction or "flotation" costs. The Federal Circuit, on appeal, found "no clear error in the [Court's] factual finding that the flotation costs provided an appropriate measure of CalFed's [cost of replacement] damages...." *CalFed*, 245 F.3d at 1350. Transaction costs include such

items as investment bankers, attorneys and consultant fees, and other expenses actually incurred and paid that were related to the issuance of equity and debt.

Such costs are not limited to the "flotation costs" of raising that new capital, but can also conclude obligations incurred on issuing that capital. The Federal Circuit has held that capital is not "costless to either the investor or the recipient"—rather, "the cost of capital is the required rate of return on various types of financing." *LaSalle Talman,* 317 F.3d at 1374–75 (quoting JAMES VAN HORNE & JOHN M. WACHOWICZ, JR., FUNDAMENTALS OF FINANCIAL MANAGEMENT 387 (10th ed.1998)). Accordingly, plaintiffs are also entitled to cost items such as the dividend and interest payments for capital-raising instruments.

The final type of reliance damage, and the one that has been in the past the most difficult to prove, is the new thrift's *costs to assume the old thrift's liabilities.* Note that this is a different theory than the liquidation cost savings restitution theory. Here, *Winstar* plaintiffs seek not to disgorge the amount that the Government allegedly saved or benefitted; rather, the reliance claim is for a cost allegedly incurred by the plaintiff upon acquiring the failing thrift.

Where plaintiffs have sought this type of damages, problems have arisen with proving the actual payment of these costs. If a profit was made or revenue was generated from the disposition of a troubled asset, then the assumption of that liability did not amount to a cost. *See CalFed,* 43 Fed.Cl. at 451–52. Often, the dollar amount claimed is for the same amount of goodwill realized in the supervisory merger.

Citing the Federal Circuit's instruction that reliance damages "provide a firmer and more rational basis" for damages, the Institutional Plaintiffs accordingly fashion their reliance claim as a cost they incurred to assume the failing thrift's liabilities, *Glendale,* 239 F.3d at 1383. However, in *Glendale,* as we noted, reliance damages were calculated by "aggregating specific costs, custodial fees, and lost historical cost of funds advantage over the bank's competitors." *Fifth Third Bank of Western Ohio v. United States,* 55 Fed.Cl. 223, 245 (2003). In fact, the Circuit has stated that damages "keyed to assumed liabilities" are "not a usable measure of either cost to the thrift or benefit to the Government." *LaSalle Talman,* 317 F.3d at 1376–77.

We believe that damages calculated using the thrift's assumed net liabilities fail for the same reasons outlined in *Glendale. CalFed,* and *LaSalle.* This is especially true when plaintiffs are able to present more concrete, support reliance claims such as those discussed above.

With these general understandings in mind, we turn now to the particulars of the Plaintiffs' claims.

## V. *Institutional Plaintiffs' Claims*

### A. Expectation Claim for Lost Profits

■ The Institutional Plaintiffs seek $88.21 million in lost profits from 1990 to 1998. As discussed above, in order to prevail on its expectation claim, SoCal must prove causation, foreseeability, and reasonable certainty of damages at trial. SoCal enlisted the assistance of Dr. Paul Horvitz to prove this theory. Despite SoCal's argument that its lost profits model is both credible and conservative, we conclude that it is neither. In short, SoCal failed to prove this claim with reasonable certainty, or that its lost profits were foreseeable.

Professor Horvitz's model is based on the differences between assets of the actual bank and the projected assets of what SoCal would have had it no breach had occurred. The lost profits are calculated by applying a rate of return on the "incremental assets"—or the assets above and beyond what the breached bank actually had, Dr. Horvitz applied a 70 basis point return on the incremental assets, based upon the assumption that SoCal would have grown to $3.5 billion in assets by 1992. This $3.5 billion was projected in the original 1987 business plan.

This theory is supported by several flawed assumptions, any one of which is fatal to Dr. Horvitz's outcome. First, the reliance upon the 1987 business plan is misplaced. A plan is merely a projection at a given point in

time—it does not reveal how it is implemented; it does not account for changing or real-world market conditions; and, as the Plaintiffs acknowledge, the plan itself was ever-changing. From August 1987 to January 1989, the Plaintiffs submitted at least three other business plans. While each of those other plans may have envisioned a $3.5 billion growth target, the methods and strategies were different. Even SoCal's first president, Mr. Yunker stated "[y]ou don't look back to the business plan and simply follow it blindly... [i]f you were to simply write a document at a point in time and ignore what happened subsequently, you can get into a lot of trouble." Tr. 816–817. With some important exceptions, this is what Dr. Horvitz's model does.

Second, neither the business plan nor Dr. Horvitz's model accurately anticipates or deals with the California recession. The testimony indicated that the recession constrained SoCal's ability to add profitable assets. Dr. Horvitz's assumptions are based on SoCal's ability to find and capitalize on profitable assets and deposits based on a growth-through-acquisition strategy. While we are certain that SoCal would have grown more than it did without the contract capital, neither the evidence nor the testimony, nor Dr. Horvitz's model, allows the Court to know how much growth would have occurred. Further, and most importantly, growth does not necessarily equal profits.

The third error in Dr. Horvitz's model is that he fails to calculate the impact on the incremental assets of the nearly $100 million infusion of capital from the first two recapitalizations. In Dr. Horvitz's "but-for" world, SoCal would have been in a significantly weaker financial position if it had not had this additional tangible capital.

Finally, we do not believe that the central assumption in the lost profits model—the 70 basis point return on incremental assets—is credible. Upon the Court's own questioning, Dr. Horvitz admitted that the multiplier could be a bit higher or a bit lower—but that in his opinion, the 70 basis point figure was about right. Dr. Horvitz arrived at this number based on his analysis of other thrifts in the California market that actually earned a 70 basis point return, the availability of assets, and the facts specific to SoCal's financial position in the 1990's.

While the Government raised real questions about this figure when it noted that only two California thrifts achieved this level of profitability, it is absolutely wrong when it argues that SoCal "limped along" for its first two years and "never came close to earning 70 basis points." Def. Initial Br. at 3, 20. SoCal was profitable by early 1990, a condition that was only reversed when the effects of FIRREA were felt. The Government also argues that the 70 basis point figure does not include all California thrifts, only the ones that survived, and that it improperly includes thrifts of different size and condition. Dr. Horvitz's testimony was persuasive that it is appropriate to compare SoCal to these other thrifts.

Notwithstanding the flaws in the Government's defense, we remain unconvinced that Dr. Horvitz's model accurately or credibly represents SoCal's expectation damages. The assertion that 70 basis points is "modest" or "conservative" does not serve as a basis for recovery. The Federal Circuit has stated that when damages are foreseeable, a "jury verdict" approach to calculating them may be appropriate. *See Bluebonnet*, 266 F.3d at 1358. However, we do not believe that a jury verdict approach is appropriate for this claim. As Judge Hodges recently held, the Defendant "could not have foreseen at the time of contracting that plaintiff would make [certain post-breach] management decision[s]. . . ." *CalFed*, 54 Fed.Cl. 704, 713 (2002).

Here, as in *California Federal*, SoCal rightly deviated from its business plans once the breach occurred; it rightly tried new and different strategies; it replaced its executive officers; and it did the best it could in difficult circumstances. But, as in *California Federal*, many of its actions were "independent and collateral undertakings"—and thus must be considered to be too remote and too uncertain to permit recovery. *Id.* at 713; *see also Myerle v. United States*, 33 Ct.Cl. 1, 27, 1800 WL 2024 (1897).

Accordingly, because Dr. Horvitz's theory does not satisfy this Court's standards for reasonable certainty or foreseeability, the Institutional Plaintiffs' claim for lost profits is hereby denied.

## B. Restitution Claim

■ The Institutional Plaintiffs seek restitutionary relief in the amount of $124,573,000.00. This dollar amount represents the alleged cost savings in 1987 to the FSLIC of $348 million in avoided liquidation costs, less the $217.5 FSLIC capital credit and the $6.3 in FSLIC indemnification payments made as a part of the 1987 contract. As noted in our discussion of *Winstar* damages standards, the Federal Circuit has repeatedly rejected restitution claims based upon this calculation. *See Glendale, 239 F.3d at 1381; CalFed,* 245 F.3d at 1351–52; *La-Salle Talman,* 317 F.3d at 1376–1377.

As the Court stated in denying the exact theory presented by the Institutional Plaintiffs in *Fifth Third Bank,* "Federal Circuit precedent is unwavering that restitution cannot be measured" this way and the Court therefore granted summary judgment for the Defendant. 55 Fed.Cl. at 244. We agree with this reasoning, though we did permit the Plaintiffs in this case an opportunity to present evidence on this claim.

The Institutional Plaintiffs argue that their claim for restitution based upon a liquidation cost savings analysis is distinguishable from the facts in *Glendale* and *CalFed.* Those cases involved interest-rate mismatches where the acquired thrifts' insolvency was expected to resolve its problems over time, as interest rates came down. That, in fact, happened. In contrast, we know that SoCal was a troubled institution by virtue of its stable of problem assets and other concerns, and thus they argue that time alone would not have helped the thrift or the Government. Interest rate problems aside, the Institutional Plaintiffs do not rebut another Federal Circuit point—the Government's obligation always persisted.

Finally, there is another fatal deficiency in this claim—the evidence of the quantum. The Court was persuaded by the very credible testimony of former Government analyst

Kirk J. Leswing. Mr. Leswing, then an official with the FHLBB, testified at length about the Management Consignment Program (MCP) and the analytical tools used by the various divisions to evaluate problem thrifts.

Mr. Leswing's testimony illustrated vividly the problems that the Government had in analyzing and determining the extent of the financial risk each thrift posed to the insurance fund. His February 20, 1987, Memorandum entitled the "Obsolescence of FSLIC's Analytical Tools" is a case study of the problems inherent in adopting the liquidation cost analysis as a measure of restitution. *See* PX 0159. Of the model used to determine the Government's alleged liquidation cost savings, Mr. Leswing wrote:

> The model used by the Analysis and Evaluation Division (AED) was invented during the high interest rate period of the early 1980's, but its time has past, both in terms of technology and methodology. The model should not have been allowed to persist into the asset problem, stable interest period, but government being government, the model became an institution. It is absurd... that the model will persist... [t]he purpose of this memo is recommend the model be put to [an] ignominious death....

*Id.* at 1.

Five months earlier, Mr. Leswing tried to sound the alarm bell inside the FHLBB about the failure of the FSLIC liquidation cost analysis as applied to Old Southern, in particular. Of the SoCal 1987 transaction, Mr. Leswing stated:

> The two associations with incorrect liquidation costs are [name of other thrift omitted] and Southern California S & LA, a $1.1 billion association ... the cost [for Old Southern] has failed internal reasonability checks, but AED has not yet been consulted.

PX 0022 (Memorandum from Kirk Leswing to Mr. Robert Brick, Regional Director for Mergers and Acquisitions, Oct. 21, 1986).

We find Mr. Leswing's critiques persuasive. To address these calculation weaknesses, the SoCal Plaintiffs' expert Dr. Horvitz

created a model which purports to improve the FSLIC estimate on the cost of liquidation. The Government notes in response, however, that several of the adjustments suggested by Dr. Horvitz were already accounted for, and further, that his mathematical assumptions (such as discounting on a quarterly basis instead of on a monthly basis) are incorrect. These critiques, valid though they are, go to the alleged numerical calculation of the dispute benefit—they do not address more fundamental defects in the claim.

In sum, like the several judges previously faced with this theory, we are simply not convinced that this is an appropriate concept of restitution damages in this case. Whether measured as time for the Government, as the Federal Circuit has stated, or measured as a "put option" for the Plaintiffs as the Individual Plaintiffs' expert urged, the $124.5 million sought by the Institutional Plaintiffs was never paid over to the Government, and was certainly not a benefit conferred by anyone to the Government. This claim is rejected.

### C. Reliance Claims

The Institutional Plaintiffs seek three forms of reliance damages—"Wounded Bank" Damages, Replacement of Lost Capital, and Assumption of Liabilities. For the reasons stated in the section on *Winstar* damages standards, we conclude that the Plaintiffs have proven their entitlement to expenses arising out SoCal's status as a wounded bank and to the costs actually incurred to replace the contract capital lost as a result of FIRREA. However, we find the claim for reliance damages based upon the assumption of Old Southern's net liabilities lacking for proof of actual payment of those liabilities.

As stated in the Factual Findings, we conclude that FIRREA harmed SoCal by removing a significant amount of contracted-for capital which was essential to SoCal's approved business plan. We further conclude that SoCal's failure to maintain capital compliance was a direct and proximate result of the Government's breach. Finally, we hold that this loss of contract capital was a substantial factor in both the increase in, or the necessity for, SoCal's actual expenses and

costs from 1989 to 1996, and that these expenses were foreseeable by the Defendant.

However, we find that the effects of the Government's breach were cured by the end of 1996, the first time that SoCal both returned to profitability and earned a solid composite 3 rating. Indeed, one year after the second recapitalization, SoCal earned "3"s in each MACRO/CAMEL rating category, and it stayed above a 3 in each exam period thereafter. We accordingly limit the Institutional Plaintiffs' damages to those incurred before 1997.

### 1. Wounded Bank Expenses

■ The SoCal Plaintiffs presented uncontroverted evidence of their wounded bank expenses in the form of detailed cost notebooks complete with meticulous summaries of its bills and, and in many instances, cancelled checks. These notebooks were supported by testimony of the appropriate corporate officials. They detail increased costs in the following areas: legal, consulting and filing fees; Federal Home Loan Bank (FHLB) collateral delivery fees; excess deposit insurance premiums; and excess OTS assessments.

First, we grant SoCal's claim for legal, consulting, and filing fees in the amount of $278,258.55. *See* PX 0281 and PX 0281A (Wounded Bank Costs Notebook). Second, for FHLB Collateral delivery fees, the SoCal Plaintiffs are entitled to $64,879.42. *See* PX 0280 (Wounded Bank Costs Notbeook/Collateral Delivery Fees) (note that the Plaintiffs' claim for these costs through mid-1997 is denied). Third, to compensate SoCal for the excess in FDIC deposit insurance premiums it was forced to pay from 1989 through 1996, we award $2,509,000.00. *See* PX 0278 (SAIF Assessments Notebook) (again, denying post-1996 claims). Finally, SoCal's damages claim for the excess assessments it paid to the OTS because of its undercapitalized status is also approved, in the amount of $789,454.00. *See* PX 0279 (OTS Exam Assessments Notebook).

The total amount of damages awarded for the Institutional Plaintiffs' wounded bank expenses is $3,641,591.97.

## 2. Excess Cost of Funds

The SoCal Plaintiffs seek $33,900,000 in excess cost of fund damages. In determining this total amount, they offered Dr. Hartzog, a former Treasurer and CFO of the Federal Home Loan Bank of San Francisco, as their expert. His testimony, which was not persuasively contradicted by the Government's experts, was credible and thorough. Dr. Hartzog calculated SoCal's excess costs of funds using three analytical approaches. With one important adjustment, we adopt Dr. Hartzog's findings.

Dr. Hartzog analyzed SoCal's excess cost of funds using three different methods—a comparative analysis, a constant maturity analysis, and a multiple regression analysis. We agree with Dr. Hartzog's testimony that the three analyses are mutually supportive of each other and should not be "considered in isolation ... each [is] a part a three-part analysis that reinforce each other." Tr. 1799. Accordingly, we present each of the analyses below.

### Comparative analysis

The first approach Dr. Hartzog undertook to analyze the impact of the breach on SoCal's cost of funds was a comparative analysis of SoCal's cost of funds, essentially a "before-and-after" study. See Tr. 1798. Dr. Hartzog compared SoCal with the 11th District Cost of Funds Index, known as COFI, which captures the total interest cost (including cost of deposits, cost of borrowing, and the cost of hedging activities) of all member institutions in the 11th District (made up of all thrifts in California, Nevada, and Arizona). The 11th District COFI is a lagging index and reflects deposits issued by 11th District thrifts over the last two prior years.

This study was designed to address whether there was indeed a widening in SoCal's cost of funds spread over COFI after the breach. Dr. Hartzog's comparative analysis showed that the spread between SoCal's cost of funds and the 11th District average widened substantially after the breach. See Tr. 1798–1802.

Prior to the breach, SoCal had an average 23 basis point disadvantage relative to the 11th District COFI and after the breach

SoCal had an average 51 basis point disadvantage relative to 11th District COFI. See Tr. 1885. A comparative analysis approach similar to the one used here by Dr. Hartzog was used by the plaintiff in *Glendale* and served as the basis for Judge Smith's award of $335.4 million in excess cost of funds damages. See *Glendale*, 43 Fed.Cl. 390, 408 (1999).

In his comparative analysis, Dr. Hartzog looked at the spread between SoCal's cost of funds and the 11th District COFI, making a downward adjustment of 19 basis points to account for the exit or the resolution of weak firms by the RTC. See Tr. 1800. As Dr. Hartzog testified, that 19 basis point adjustment used in his comparative analysis is based on the impact reported in the well-respected article written by authors Prafulla G. Nabar and John F. Tierney. See Tr.1901–1902; DX 608 ("Market Dynamics of Eleventh District COFI in a Post–RTC World," JOURNAL OF FIXED INCOME, Dec. 1993, at p. 63). Dr. Hartzog's 19 basis point adjustment is consistent with his own analysis conducted during his tenure at the FHLBank–San Francisco. See Tr. 1887–1889.

Dr. Hartzog testified that it would not be appropriate to rely on his comparative cost of funds analysis alone to assess damages in this case, because while the comparative analysis proves that the spread between SoCal's cost of funds and that of the 11th District widened after the breach, it does not disclose what factors caused this increase. See Tr. 1803.

### Constant Maturity Analysis

Using a second approach called a "constant maturity analysis," Dr. Hartzog determined whether on an "apples-to-apples basis," if one looked at common liability products, SoCal paid higher interest rates on the same products for which other institutions paid a lower interest rate. See Tr. 1798–1804. A "constant maturity analysis is used very frequently in financial markets." Tr. 1804. Dr. Hartzog's analysis looked at all of SoCal's certificate of deposits (CDs) and concluded that after accounting for the maturity differences on CDs between SoCal and the 11th District, on average, SoCal paid 41 basis

points more on an equivalent maturity CD than the industry average.

Dr. Hartzog testified that it would not be appropriate to rely on his constant maturity analysis alone to assess cost of funds damages in this case because this analysis shows SoCal paid more for its certificate of deposit (CD) products with equivalent maturities, but the analysis does not account for what factors caused this increase; moreover, it examines only CD's, one category of SoCal deposits. Tr. 1805.

### Multiple Regression Analysis

Accordingly, Dr. Hartzog used a three method to calculate SoCal's excess cost of funds. This third method used a multiple regression analysis. While the Government challenged Dr. Hartzog's analysis, the Government's own expert, Dr. William Hamm, testified that multiple regression analysis has the potential to be a reliable means of analyzing economic statistics. See Tr. 2827. Furthermore, Dr. Hamm did not perform his own multiple regression analysis to determine the impact of capital on SoCal's cost of funds because it was not part of the "scope of [his] assignment from the Department of Justice." See Tr. 3341, 4817–4818. Thus, he could not rebut in any way Dr. Hartzog's findings, which we find credible and persuasive.

Dr. Hartzog's multiple regression analysis focused on the impact that capital had on SoCal's cost of funds, while taking into account other variables that were also important in affecting SoCal's cost of funds such as its profitability, growth, use of wholesale funding, and return on average assets. Dr. Hartzog determined that the loss of SoCal's regulatory capital *caused by the breach* between the period of March 1990 and December 1997 resulted in a 25 basis point (1/4 of 1%) average increase in SoCal's cost of funds relative to the 11th District COFI, resulting in $33.9 million in damages. See Tr. 1811–1812.

Despite the fact that interest rates did fall substantially throughout the early 1990's during the California recession, we find that this is irrelevant to SoCal's *relative* cost of funds damages calculated by Dr. Hartzog. The fact that all interest rates went down after FIRREA does not eliminate SoCal's cost of funds damages. SoCal's Executive Vice President Doyle testified that SoCal's costs for funds were *hurt* much more than *helped* by FIRREA because despite the drop in overall rates after FIRREA, SoCal was forced to pay higher rates than its competitors which had both more capital and paid lower rates. See Tr. 740–742, 761. Dr. Hartzog attributed the steep decline in SoCal's absolute cost of funds after December of 1989 to the worldwide substantial reduction in interest rates. See Tr.1950.

Both Dr. Hartzog and Dr. Horvitz agree that it is implausible that the loss of regulatory capital had no impact on SoCal's cost of funds. See Tr. 1820 (Dr. Hartzog: "[i]n all my experience with financial markets worldwide, I have yet to encounter a market in which a more risky firm does not result in having higher funding costs."); Tr. 4820–21 (Dr. Horvitz: "[i]f the risk is higher, there should be some effect on return, and I don't know of [any] economists who argue that the effect is zero.").

The regulators acknowledged that weak thrifts pay more for their deposits. OTS Examiner Robert A. Baidoo, Jr., the examiner in charge of three SoCal examinations, testified that "an attribute of most of the failed institutions was that they were paying high cost of deposits because the market, that was the market." Tr. 3718. Applying that knowledge to SoCal's problems, Mr. Baidoo concluded: "[SoCal] was a failed institution, and because of that, the market basically they have to pay a—higher rates on their deposits in order to attract deposits." Tr. 3720–3721.

The Court concludes that Mr. Baidoo, and Doctors Hartzog and Horvitz are entirely accurate and credible in their analysis of SoCal's experiencing higher costs of funds after the breach. We join the Federal Circuit in concluding that the Government's breach was the substantial factor in these increased costs. See, e.g., Glendale, 239 F.3d at 1383; Bluebonnet, 266 F.3d at 1356.

In total, the SoCal Plaintiffs seek $33.9 million in excess cost of funds damages, from the first quarter of 1990, until the last quar-

ter of 1997. Because we conclude that the effects of the Government's breach were cured by the end of 1996, we grant damages for SoCal's excess cost of funds from the first quarter of 1990 through the last quarter of 1996, for a total amount of $32,320,000.00. For a detailed breakdown of the costs of funds by quarter, see PX 0347 (Calculation of Excess Cost of Funds Damages).

### 3. Cost of Replacement Capital/Recapitalization Costs

■ The SoCal Plaintiffs also presented notebooks containing the itemized bills, cancelled checks, financial statements, and other documents supporting their claim for transaction costs to replace the lost contract capital. Despite repeated attempts, the Government could not attack with any merit the costs claimed in these notebooks. Indeed, in only one instance did the Government successfully contradict any of the costs—and it was an accidental double counting that was immediately corrected.

The Federal Circuit has approved this form of reliance damages. For the reasons stated in the Factual Findings, we conclude that the Institutional Plaintiffs are entitled to these costs for the first two recapitalizations, 1992 and 1995. Costs incurred in the 1997 and 1998 transactions are hereby denied.

#### a. 1992 "Recap"

The SoCal Plaintiffs are entitled to $5,218,000.00 in transaction costs and expenses related to the issuance of SCH preferred and common stock and debt in 1992. We also award $556,000.00 for the payment by SoCal of dividends on the senior preferred stock issued in 1992. See PX 0282 (Exhibit A/Cost of 1992 Senior Notes Notebook).

#### b. 1995 "Recap"

The SoCal Plaintiffs are entitled to $714,374.04 in transaction costs and expenses related to the issuance of SCH preferred and common stock and debt in 1995. See PX 0284 (Exhibit B/Binder 2/SoCal Plaintiffs' 1995 Recapitalization Expenses). The SoCal Plaintiffs also incurred interest and dividend expenses on the stock and debt issued in 1995. Therefore, we award $3,508,00.00 in

interest costs, see PX 0283 (Exhibit B/Binder 1/Cost of 1995 Senior Notes), and $19,439,855.40 for the payment by SoCal of the accumulated and unpaid dividends on all outstanding preferred stock issued in 1995. See PX 0285 (Exhibit C/Preferred Stock 1995 Cost Notebook).

#### c. 1997 & 1998 "Recaps"

The Institutional Plaintiff seek $17,163,000.00 in transaction costs and dividend expenses related to the 1997 REIT transaction. See PX 0286 (Exhibit D/1997 Preferred Stock/REIT Notebook).

They also claim $10,593,000.00 in transaction costs and $68,753,000.00 in costs related to the redemption of preferred stock prior to the 1998 IPO. See PX 0287 (Exhibit E/1998 IPO Cost Notebook).

As stated above, we hold that these two transactions were undertaken for independent business purposes, wholly unrelated to the Government's breach, which we conclude was mitigated as of the end of 1996. Accordingly, we deny the Institutional Plaintiffs' claims for damages based upon expenses incurred in 1997 and 1998.

### 4. Assumption of Old Southern's Net Liabilities

■ The SoCal Plaintiffs also claim $79,188,000.00 in reliance damages for the assumption of Old Southern's net liabilities in the 1987 acquisition. This amount is calculated using the $79,660,000.00 net liability amount booked as goodwill in 1987, less an off-set for $472,000.00 in dividends paid by SoCal to SCH prior to the breach.

We do not award these damages, and for two reasons. First, as stated, we agree with Judge Miller's holding in *Fifth Third Bank* that the Federal Circuit has not endorsed this damage theory in *Winstar* cases. 55 Fed.Cl. at 245. Second, and most importantly, the Institutional Plaintiffs presented very little evidence that it actually paid down these liabilities—an absolute requirement for reliance damages. The Plaintiffs made no effort to identify the troubled loans or assets that form the basis of this claim. Though we are certain that Old Southern had a tremen-

dous amount of liabilities which the new institution was forced to wrestle with, there was no evidence that SoCal made cash disbursements to resolve these liabilities.

Accordingly, the SoCal Plaintiffs' claim for damages based upon the assumption of liabilities is denied.

### D. Conclusion to the Institutional Plaintiffs' Damages Claims

While we reject the Institutional Plaintiffs' claims for lost profits, for damages arising out of the assumption of Old Southern's net liabilities, and for the disgorgement of the alleged liquidation cost savings of the Government, we do allow, in part, their claims for wounded bank damages, for its excess cost of funds as a result of the breach, and for SoCal's actual costs of replacing the contract capital. The total amount to be awarded to the Institutional Plaintiffs is $65,397,821.41.

### VI. *Discussion of Individual Plaintiffs' Claims*

#### A. Introduction

██ The Federal Home Loan Bank Board explicitly conditioned its approval of the SoCal merger transaction on the execution of the RCMA by the FSLIC, SCH, SoCal, and the Individual Plaintiffs. Res. 87–511, p. 7, proviso 4. Thus, we held in our Liability Opinion, Secretary Simon and his fellow signatories' roles were not ancillary, as the Government urges, but rather central to this transaction. 52 Fed.Cl. at 542. The thrift would have failed—and the acquisition never have occurred—but for the Individual Plaintiffs. Our earlier recited findings make this clear beyond any peradventure of doubt.

As noted, the Individual Plaintiffs were represented by separate counsel, and advanced as their principal claims different damages theories. The expert for the Simon Plaintiffs was Dr. Allan Kleidon, a doctor in finance and economics and a corporate finance professor at the University of Chicago School of Business. The DMT Plaintiffs' expert was Dr. Roger C. Kormendi, a doctor of economics specializing in investment banking and other financial advisory services.

Prior to trial, the Individual Plaintiffs adopted each of their co-Plaintiffs' damages theories as alternative claims. During their cases-in-chief, each Plaintiff's counsel was permitted to examine the others' expert, and the Government was of course afforded an opportunity to cross examine. While we recognize that the Individual Plaintiffs have pursued different theories, we adopt one theory and use a single calculation for those damages.

The Individual Plaintiffs presented all three of the damages theories discussed above—expectation damages, restitution damages, and reliance damages. While we understand that the aim of expectation damages is to put the plaintiffs in the position they had been if the contract had been performed, for the same reasons we discussed in analyzing the SoCal Plaintiffs' claim for lost profits, it is equally impossible to do so for the Individual Plaintiffs. As to their claim for reliance damages, or the cost of performance on the contract either before or after the breach, it is also difficult to award this damage because the out-of-pocket costs caused by the breach (i.e.: wounded bank damages and cost of replacement capital) were borne by the Institutional Plaintiffs.

The Court believes that awarding money-back restitution for their 1987 investments is not the appropriate method to value their damages or to compensate them for the harms suffered. Instead, we conclude that the dilution theory presented by Dr. Kleidon is the most accurate and credible claim advanced by the Individual Plaintiffs.

It is modeled after the Federal Circuit's holding in the *Bluebonnet* case. 266 F.3d at 1348. Because the Circuit's holding is instructive to the damages claims presented by the Individual Plaintiffs, we discuss it at some length below.

In that case, the plaintiffs, CFSB and a individual named Mr. James M. Fail, "concerned with a threat of seizure and because neither Fail nor CFSB had sufficient funds to infuse capital," borrowed money post-FIRREA from an individual to infuse capital into the thrift they had acquired from the Government in a supervisory merger several

years earlier, Bluebonnet Savings Bank. *Id.* at 1352.

Several years later, by 1993, despite that first recapitalization, Bluebonnet was not generating returns sufficient to permit it to declare dividends. Like SoCal, the Government's restrictions forbade Bluebonnet from many corporate activities, such as dividends distributions, material transactions, and branch acquisitions. The dividends were necessary to allow CFSB and Fail to repay the loan. *Id.* at 1353.

Concerned with the status of the thrift, the lender/investor reached an agreement with Fail and CFSB concerning these outstanding loans called the Economic Benefits Agreement or "EBA." Under the EBA, Fail and CFSB were required to give the individual a 49% interest in the future profits of the thrift.

During their trial on damages, CFSB and Fail argued that "it would not have entered into the EBA but for the breach and, therefore, [was] entitled to the entire cost of the EBA"—in other words, that they were entitled to the stake that they were forced to give up. *Id.* at 1356. The trial court denied that request. *Bluebonnet,* 47 Fed.Cl. 156 (2000).

On appeal, the Federal Circuit held that the plaintiffs had "persuasively argue[d]" that they would not have given up their stake in Bluebonnet absent the effects of FIRREA. 266 F.3d at 1356. The Circuit specifically noted the plaintiffs' attempts at capital raising:

> Before entering into the EBA, Bluebonnet made considerable efforts to obtain conventional financing and to acquire a ... partner, but was unable to do so, in large part, because of the passage of FIRREA and the unfavorable climate it created for investments in thrifts.

*Id.*

Nevertheless, the trial court denied their claim for damages, in part because of their failure to establish a "but-for" world, which is ordinarily required to state a valid claim for expectancy damages. But the Circuit held that the trial court was "clearly erroneous." *Id.* The plaintiffs did not have to create a but-for world, presumably because the type of damages requested are not expectancy damages and because of the Court's "explicit finding" of causation.

In concluding that the plaintiffs were entitled to damages, which ultimately amounted to approximately $132 million, the Federal Circuit stated:

> In the absence of the breach, Fail and CFSB would not have agreed to the EBA because dividend financing would have been available and it would have been unnecessary to give up a significant equity stake in CFSB to obtain financing.

*Id.*

It is against this backdrop that we analyze the damages claims presented by the Individual Plaintiffs. As contract parties, the Individual Plaintiffs are entitled to damages from the Government's breach. As stated in the Factual Findings, we conclude that each of the Individual Plaintiffs were harmed and that the harm was separate and distinct from that suffered by the Institutional Plaintiffs. See *Strougo,* 282 F.3d at 172–75 (recognizing that forced recapitalization and "reallocation of equity" is a harm suffered by existing shareholders, and an award solely to the corporation will not compensate the equity holders for that loss).

This conclusion, that the investors were harmed individually, is supported by an earlier decision the Federal Circuit concerning the 1987 contract upon which the Plaintiffs in this case are claiming damages. As noted, the Ariadne Group brought its own separate lawsuit to vindicate its rights under the 1987 acquisition agreement. That suit was ultimately dismissed on statute of limitations grounds.

In upholding Ariadne's dismissal, the Federal Circuit stated:

> [A]s the predominant holder of preferred shares in both SoCal and the holding company that owner SoCal, Ariadne also was damaged by the government's breach. *Loss of the supervisory goodwill made SoCal, and Ariadne's investment in SoCal, considerably less valuable.*

*Ariadne,* 133 F.3d at 878 (1998) (emphasis added).

We also find that the Government's breach was a substantial factor in the harm suffered, the complete loss of their ownership interest. To paraphrase the Federal Circuit, in the absence of the breach, Arbur and Messrs. Doumani, Martin, Simon, and Thrall would have never agreed to the recapitalization transactions that eliminated their ownership interests. Indeed, in the absence of the breach, SoCal would not have needed to recapitalize, and further, the Individual Plaintiffs would have continued to own their shares well beyond 1995.

Finally, we hold that it was foreseeable to the Government that new capital contributions to recapitalize SoCal after the Government's breach would result in dilution and eventual extinguishment of the Individual Plaintiffs' ownership interest in SCH common equity. See, e.g., Tr. at 4175 (Mr. Shand testifies that recapitalizations involving equity can be dilutive to existing equity holders, and that such costs would be borne by the existing equity holders).

With these findings, we turn to the particulars of their alternative theories.

## B. Dilution Theory

The Individual Plaintiffs dilution theory seeks to return to them their 1987 equity share that was diluted in 1992 and lost in 1995. In other words, the damages awarded under this theory either return to them the value of the breached thrift at a given point in time, or it returns to them a dollar amount of what it would cost to replace their equity in the breached thrift. See Tr. at 1971 (Dr. Kleidon).

Consequently, it does not seek to award damages based on what might have been if there had been no breach—in other words, as in Bluebonnet, no "but-for" world is required. As it is not an expectation damage theory, it does not calculate the value of the Individual Plaintiffs' share of SoCal in a non-breach world. Dr. Kleidon also does not calculate or award any lost profits or share of lost profits to the thrift caused by the breach. It merely returns to the Individual Plaintiffs their share in the breached thrift; it does not address or seek to address any increased value the thrift might have had.

This measurement of damages is based on the real world, not a hypothetical world. See Tr. at 2005–2007 (Dr. Kleidon explains how his calculation accounts for the competitive conditions, interest rate environment, regulatory scrutiny, and overarching industry conditions by measuring the lost value in the actual SoCal, as it existed in the real world). To do so, Dr. Kleidon traces the SCH common equity through time—at five key stages: the initial 1987 equity; the two recapitalizations; the 1998 IPO; and the 2001 FBOP merger.

As to what assumptions his theory makes, Dr. Kleidon testified that:

> [t]here's really only one key assumption [underlying my analysis], that is that, absent the breach, SCH would not have undertaken the highly dilutive recapitalizations that it did undertake in 1992 and 1995. And what that means is that, absent the breach, the [Individual] Plaintiffs would not have had their original 1987 common equity stake cancelled without compensation by SCH.

Tr. at 1995.

When asked whether performance of SoCal in his calculation resembled its performance in the real world, Dr. Kleidon stated: "I wouldn't say it's somewhat like [the real world]. It is exactly what happened in the real world because that's what I'm basing my calculation on." Tr. at 2007. We agree with that conclusion.

We find Dr. Kleidon's method of calculating dilution damages very credible. It is simple and straightforward. He uses two methods for calculating the cost of restoration—first, by tracing the "common equity" and second, by tracing the "total equity."

The evidence indicates that the common equity method is the preferred method, and it is the one that Dr. Kleidon recommends the Court adopt. See Tr. at 2023. However, because the Individual Plaintiffs owned less total equity in all of SoCal in 1987 than they did common equity, the Government criticized the common equity method. Using the total equity method—which is not "as direct [or] as straightforward as the common equity

approach—Dr. Kleidon calculated the Individual Plaintiffs' lost interest as much higher than that under the common equity method." *Id.* This is because of the large conversion factors for the preferred stock into common stock during the 1998 IPO.

In other words, the total equity method overstates the harm suffered by the Individual Plaintiffs. We are persuaded by Dr. Kleidon that the common equity tracing approach is the proper method, and we adopt it here.

Using either approach, Dr. Kleidon traces what happens to the common shares acquired by the Individual Plaintiffs in 1987. At that time, they owned 100% of the SCH common stock. *See* PX 1201 (Common Stock Investors in SCH, April 30, 1987). By 1992, after the first recapitalization, their stock was converted to Class B Common, and it amounted, in total, to only 51.36% of the total SCH common stock. See PX 1202 (Common Stock Investors In SCH Following 1992 Recapitalization). By 1995, the Individual Plaintiffs owned zero shares in SCH. Their entire 100% ownership share had been eliminated without consideration during the 1995 recapitalization. See PX 1203A (Common Stock Investors in SCH Following 1995 Recapitalization).

Next, Dr. Kleidon accounts for any cash paid for common equity in either of the recapitalizations. Of the original contract signatories, only Arbur participated in 1992, paying $777 for a few shares of common equity as a part of the purchase of SoCal debt. Finding that to be "effectively zero" and statistically insignificant given the total number of outstanding shares, Dr. Kleidon rounds that number to zero. Tr. 2014.

Next, and most importantly, to account for the new equity that was issued in the 1998 public offering, Dr. Kleidon adjusts the number of shares outstanding in SCH. Pre–IPO, the percentage of common stock was 100%. However, there is a large amount of new common stock created in the IPO, from both the conversion of the preferred stock into common, and the issuance of new shares. The net result is that the 100% common equity owned by the Individual Plaintiffs in 1987 was now only 14.41% of the SCH common equity post-IPO.

In other words, 14.41% represents the Individual Plaintiffs' post-recapitalization ownership share considered together. *See* Tr. 2020. To return the Individual Plaintiffs their interest, Dr. Kleidon then needed to determine each Individual Plaintiff's original share as a percentage of the new post-IPO common equity.

Because the Simon Plaintiffs owned 29.74% of the 1987 common stock, if they had continued to own their shares post 1998, they would have owned 4.29% (which is 29% of 14.41%), or 937,537 shares, of the breached bank. *See* Tr. 2020. Similarly, Messr. Doumani and Thrall would have 2.21% of the post–1998 thrift, and Mr. Martin would have owned 1.11%. Though Dr. Kleidon performed these calculations in Court, they are simple mathematics, not complicated financial modeling.

The final input into this equation is what market value is each share worth. Dr. Kleidon offered two possible points in time: 1998 and 2001. The importance of a publicly-traded market value for the shares of SCH common stock cannot be overstated. Not only does it permit the Court to award damages based on a concrete, non-hypothetical model, but it "provides an objective measure of the value of that equity." Tr. 1997 (Dr. Kleidon). Moreover, it gives an "objective measure of what it would cost to repurchase and replace that equity"—the central purpose behind this damages theory. *Id.*

One of the Government's testifying experts, professor of finance Dr. Allan C. Shapiro, agreed that a publicly traded market price was the best indicator of value. *See* Tr. at 4570 (testifying that "what I would agree is that if you're trying to measure value at a given point in time, you are better off using a market value, based on a publicly traded price, than you would be if you attempted to do your own analysis, as of that specific date.").

In 1998, the price for stock sold into the public markets during the IPO was $13.75 per share. In 2001, the negotiated price for the FBOP merger was $10.00 per share.

For several reasons, the Court concludes that the 1998 date is the best date upon which to calculate damages. First, it is closer in time to the breach. We cannot be certain how long the Individual Plaintiffs might have owned their shares. The only thing of which we are certain is that they would not have walked away from their ownership interest in 1995. The testimony of each of the Individual Plaintiffs and the weight of the documentary evidence supports the conclusion that these individuals wanted to own and run SoCal. They wanted it to thrive, and made every effort to insure its eventual success. However, it is conceivable that they would have sold their shares, as the post–1995 common stock holders did, during the 1998 IPO.

Second, the 1998 market value is a more accurate value than that arrived at in the 2001 merger negotiations. It is a solid, market-driven—and market-tested, we might add—valuation. The Government's principal expert in this and in many other *Winstar*-related cases, Dr. William Hamm, testified that in his own expert report on SoCal, he used the IPO date to calculate possible damages to the Plaintiffs. *See* Tr. 3427. The Government's accountant, Mr. Randlett did so as well. *See* Tr. 3886.

We are thus convinced that Dr. Kleidon's calculation of restoring the Individual Plaintiffs' their ownership interest in the breached bank is the appropriate method of damages in this case, and find that they should be restored their shares as of 1998. Applying the 1998 IPO price, the Simon Plaintiffs are awarded dilution damages in the amount of $12,891,113.75, or 937,537 shares times $13.75. *See* Tr. 2186 (Dr. Kleidon). Analyzed individually, the Estate of William E. Simon, Sr. is entitled to $8,624,168.00 and Arbur is entitled to damages in the amount of $4,266.965.00.

Upon questioning by counsel for the DMT Plaintiffs, Dr. Kleidon also stated that based upon that Simon Plaintiffs' damages amount, another way to examine this claim is to take the damages and divide it by the number of original shares in 1987. In doing so, Dr. Kleidon has calculated that the dilution damages as of 1998 per each share received in 1987 is $444.52 ($12,891,113.75 divided by the Simons' 29,000 shares in 1987). *See* Tr. 2043–2048; *see also* DX 0877 (Expert Report of Dr. Kleidon). Using that calculation, Mr. Doumani is awarded $6,223,280.00 in dilution damages based on his 14,000 shares. Similarly, Mrs. Thrall, as Executor of the Estate of Mr. Thrall is entitled to $6,223,280.00 (also 14,000 shares) and Mr. Martin is awarded damages in the amount of $3,333,900.00 (7,5000 shares).

The Individual Plaintiffs proved their dilution damages with more than reasonable certainty—Dr. Kleidon's calculations allow the Court to award damages based on a set point in time, using a fixed number of shares representing each Plaintiff's original ownership interest, and a real, non-hypothetical market valuation.

## C. Additional Claims

### 1. Lost–Value Theory

The Individual Plaintiffs assert that the Government's breach caused an immediate and precipitous devaluation of their contracted-for-business opportunity, thereby allowing them to claim damages for lost-value, an expectancy theory. The DMT Plaintiffs' expert, Dr. Roger Kormendi, measured the Individual Plaintiff's lost-value damages. Applying the "loss of chance doctrine" to measure damages for breach of contract entails determining the likelihood that performance would have benefitted the plaintiffs by a particular amount, and then "discount[ing] [the amount] to reflect this likelihood." *Koby v. United States*, 53 Fed.Cl. 493 (2002) (citing Restatement (Second) of Contracts § 348(b)).

Using a Multipath Simulation ("MPS") analysis, also known as the "Monte Carlo Model" (an unfortunate term that was not completely explained at trial), a technique for valuing financial opportunities with option characteristics, Dr. Kormendi looked forward from the time of the breach. He quantified the difference in value between the opportunity to own SoCal with almost $300 million in contracted-for regulatory capital and the opportunity to own SoCal without that capital. The DMT Plaintiffs argue that, by measuring

the dramatic decline in the value of the implied option, Dr. Kormendi's MPS model appropriately measures the DMT Plaintiffs' damages here.

Dr. Kormendi also presented two separate implementations of his lost-value model. In the first, he applied the conservative assumption that the Individual Plaintiffs would not use the excess regulatory capital granted by the contract to support growth, but would instead hold it as a large capital cushion. Under this theory, the DMT Plaintiffs claim $7.84 million for Mr. Doumani and Mrs. Thrall, and $4.20 million for Mr. Martin. The Simon Plaintiffs claim $16.24 million. In the second analysis, Dr. Kormendi applied the more realistic assumption that SoCal would use the regulatory capital to support moderate growth. Under this theory, the damages claimed are $15.03 million for Mr. Doumani and Mrs. Thrall, and $8.05 million for Mr. Martin. The Simon Plaintiffs claim $31.13 million.

According to Dr. Kormendi's simulated performance paths, had there been no breach, the thrift's financial performance could have followed any one of an infinite number of paths, with each path representing one possible course of financial performance, as measured by the level of the thrift's book equity. Some paths show immediate success; some show periods of struggle followed by success; and some show failure. Incorporating reasonable parameters to reflect actual conditions and reasonable expectations as they existed in 1989, Dr. Kormendi's model generated several thousand such paths.

All paths begin at zero tangible equity, reflecting the actual condition of the thrift at the time of the breach. In the model, the paths continue over a ten-year time horizon, with results based primarily upon: (1) long-run expected returns; (2) expectations that the thrift crisis would impair performance but that surviving thrifts would achieve higher returns after resolution; (3) reasonable leverage of surplus capital (in the moderate-growth model only); and (4) randomized variation based on the actual volatility of thrift earnings in southern California around the time of the breach. When a path in Dr.

Kormendi's model takes the thrift out of regulatory capital compliance, the path hits the "line of death" and terminates with no return to the investors.

Ultimately, Dr. Kormendi determined that the breach deprived the individual Plaintiffs of a one-in-three chance of gaining $300 million in book value. Multiplying the probability that SoCal would have followed a Promise–Supported Path times the expected outcome of being on such a path determines the total harm caused by the breach in terms of book value (i.e. $1/3 \times \$300$ million, or $100 million). Because the model simulates the thrift's performance in terms of book equity, Dr. Kormendi applied a book-to-market multiplier to convert the book-value harm into market value damages for all of the thrift's owners. Dr. Kormendi then allocated the market value damages between the common and preferred shareholders, and finally among the common shareholders, based on the shares as outlined in the 1987 contract.

As an initial matter, the Government argues that the Monte Carlo Model fails the standards for scientific reliability and acceptability. Before trial, we denied the Defendant's motion *in limine* on this same basis, and we allowed Dr. Kormendi to testify. Dr. Kormendi has excellent credentials and has worked on these issues and analyzed the S & L industry for years, among other things as a consultant to the U.S. Senate Banking Committee. Nonetheless, while we believe his model may be scientifically acceptable, we did not find that it credibly or accurately described the harm to the Individual Plaintiffs. Further, we believe the theory presented by Dr. Kormendi fails the "reasonable certainty" test as well—the very fact that it is so dependent on so many variable inputs, and generates so many thousands of expectation path conclusions, indicates, in the Court's mind, its legal flaws.

Second, and we think correctly, the Government argues that the evidence at trial refuted the DMT Plaintiffs' argument that the regulators gave SoCal an "option" to leverage the firm to incredibly low amounts of negative tangible equity. Indeed, the Government notes that the model is based

upon a theory that the Plaintiffs could operate SoCal with guaranteed deposit insurance but without regulatory intervention, and continue leveraging the contract capital until the thrift had approximately $200 million in negative equity. This is a highly implausible premise—and one refuted by the contract itself. The Government correctly argues that the contract explicitly insured against the risk of "moral hazard" by including the safety and soundness provisions in the 1987 contract. Thus, the Individual Plaintiffs have also failed to prove that the Government could have foreseen the damages described by Dr. Kormendi's model.

The Defendant further asserts that the return on assets (ROA) and return on equity (ROE) parameters in Dr. Kormendi's model are improper and highly speculative, as they are based upon his own subjective beliefs regarding what could be expected looking forward from 1989. Specifically, the Defendant points out that the model assumes that poor performance in the early years leads to higher returns in later years, even though the Government's experts testified that the opposite effect would be true.

Further, the Defendant argues that Dr. Kormendi's model unreasonably suggests that the market would have valued SoCal in 1989—now a troubled, privately-held thrift—at two-to-three times its book value, when it valued other thrifts at just 0.6 of their stated book value. Finally, the Defendant demonstrated that the model's chosen discount rate is untenable because: (1) the dramatic swings in estimates resulting from small changes in the discount rate show the unreliable and uncertain nature of the model; (2) the 10% discount rate used is dramatically inconsistent with the 20% discount rate used on preferred stock in Dr. Kormendi's replacement model; and (3) Dr. Kormendi's use of his own "hand calibrated" and result-driven 10% risk-adjusted rate flatly refutes his claim that a risk-free rate (i.e. 6%) is applicable to multipath simulations. The use of a risk-free rate is not appropriate for multipath simulation unless the risk-neutral probability distributions are applied; they are not in Dr. Kormendi's model.

In the final analysis, what Dr. Kormendi's simulation attempts to model are the DMT Plaintiffs' dimunition—or lost value—damages. For many of the same reasons that we believed that the Institutional Plaintiffs' expectation damages were flawed, we also agree with the Defendant that this Monte Carlo or MPS theory of damages is flawed. There was absolutely no proof that the Government could have foreseen the growth multiples upon which this theory is premised. Because it is too speculative, and because we cannot be reasonably certain of its application, inputs, or outcomes, we decline to adopt it here.

### 2. Cost of Replacement Capital Model

The Individual Plaintiffs put forward a theory on the cost of replacement capital which they argue provides an alternative measure of damages that satisfies all legal standards. Dr. Kormendi's model measured the cost the Individual Plaintiffs would have incurred had they been able to replace the contracted-for regulatory capital without dilution. In formulating the model, Dr. Kormendi modeled a hypothetical capital instrument, that is, a self-redeeming preferred stock carrying the 20% dividend rate the market required (and which would thereby qualify as regulatory capital and would amortize over the same period as the contract capital). The instrument therefore replicated the salient characteristics of the contracted-for forbearance capital that was lost as a result of the passage of FIRREA. While at trial Dr. Kormendi presented cost of replacement capital damages calculated using both the 20% dividend rate and a risk-free discount rate, in the DMT Plaintiffs' Initial Post–Trial Brief, the Plaintiffs notified the Court that they do not seek damages discounted at the risk-free rate. *See* DMT Plaintiffs' Initial Post–Trial Br. at 33.

Dr. Kormendi's model calculated cost of replacement capital without dilution damages in the amount of $15.42 million for Mr. Doumani and Mrs. Thrall, $8.26 million for Mr. Martin, and $31.9 million for the Simon Plaintiffs.

However, the Defendant criticizes Dr. Kormendi's calculations as hypothetical because the model seeks to determine the cost of replacing the contract capital without diluting the Individual Plaintiffs' contracted-for ownership interest; in other words, it seeks to determine an amount of damages on a cost that these Plaintiffs did not incur. The Defendant notes that, in asserting that the model appropriately measures the cost of cover, the DMT Plaintiffs rely upon *LaSalle Talman Bank, F.S.B. v. United States*, 45 Fed. Cl. 64, 103 (1999). However, in *LaSalle* the Court rejected the same methodology offered by Dr. Kormendi precisely because it was hypothetical and, therefore, irrelevant to how plaintiffs actually mitigated. *Id.*

Simply put, we do not believe that Dr. Kormendi's hypothetical model accurately reflects the damages incurred by the Individual Plaintiffs. While we believe that the breach harmed them to be sure, and while we know that they bore many costs to replace the contract capital, this damages theory is not the appropriate method to compensate them for their losses. We believe the dilution damages approach more accurately determines the loss they suffered.

### 3. DMT Plaintiffs' Derivative Claims

In the alternative, the DMT Plaintiffs seek three additional categories of damages. First, they seek their proportional share of any lost profits recovery that SoCal may have received. Second, they also seek their share of any recovery from either of the Institutional Plaintiffs' liquidation cost savings claim or benefit conferred restitutionary theory.

Because the Institutional Plaintiffs did not prevail on those theories, we need not address these damages claims. While we decline to reach the same legal conclusion reached by this Court in *LaVan v. United States*, 56 Fed.Cl. 580 (2003), denying derivative claims filed by investor Plaintiffs, we do not believe that these are appropriate categories of damages for these Individual Plaintiffs.

### D. Money–Back Restitution

Finally, the Individual Plaintiffs claim in the alternative that they are entitled to money-back restitution. They cite the Supreme Court's decision in *Mobil Oil*, where it stated: "if the Government [breaks] an important contractual promise . . . the Government must give the [plaintiffs] their money back." 530 U.S. at 608, 120 S.Ct. 2423. This principle has been applied in *Winstar*-related cases. *See, e.g., Hansen Bancorp*, 53 Fed.Cl. at 98, 110.

If we did not award damages based on their dilution theory, the Individual Plaintiffs would have been entitled to money-back restitution in the amounts of money they contributed pursuant to the 1987 contract. The Simon Plaintiffs contributed $1,516,923.00; Messrs. Thrall and Doumani each invested $732,308.00; and Mr. Martin invested $392,308.00.

We do not grant these amounts in restitution because it would overlap the damages awarded under the dilution theory.

### E. Government's Defenses to Individual Plaintiffs' Claims

#### 1. No Offsets Required

The Defendant has asserted that the Individual Plaintiffs are not entitled to the return of their investment because Ariadne later cancelled the loans that financed the investment, and because SoCal Holdings paid a dividend in 1988. The Government has the burden of proving offsets, and it has not proven that any offset is appropriate in this case. *See Minnesota Chippewa Tribe v. United States*, 14 Cl.Ct. 116, 123 (1987); *G & R Corp. v. Am. Sec. & Trust Co.*, 523 F.2d 1164, 1176 (D.C.Cir.1975).

Ariadne cancelled the notes as one element of a broader global settlement with the Individual Plaintiffs. Defendant has come forth with no evidence that the Individual Plaintiffs received any net benefit from that transaction, let alone a net benefit equal to the face amount of the loans. Our holding on the Government's "Ariadne Defense" is identical to that of Judge Emily C. Hewitt in *Westfed Holdings*, another thrift that Secretary Simon's investment group rescued. 55 Fed.Cl.

at 559. At trial, we received testimony about the Individual Plaintiffs' involvement in several thrifts, and about the broad nature of the Ariadne settlement. Judge Hewitt found that no offset was appropriate in that case, holding that the settlement was "unrelated to the contract [at issue in the case]" and that it was in exchange for a "release" of a claim in "separate transaction." *Id.* We agree, and thus deny the Government's request for an offset based upon this theory.

The Government's argument that the Simon Plaintiffs' damages should be offset because of the proceeds it received from sales in 1998 and 2001, directly traceable to their investments in the two recapitalizations, is clearly wrong. The gain—if there was one—was on new money, having nothing to do whatsoever with their rights under the 1987 contract. It is as though they made money investing on widget futures, and no offset or any other reduction in damages is appropriate.

Similarly, the Defendant is entitled to no offset for any dividends declared by the thrift or holding company. Although the funds nominally passed through the Individual Plaintiffs, the investors received no net benefits from these payments, because amounts equal to the dividends were paid over to Ariadne as interest when that note was still valid.

Moreover, even if either event had benefitted the investors, the Government was not the source of the purported benefits. Accordingly, as a matter of law, the Government may not now claim these collateral "benefits" as an offset. *See Landmark Land Co. v. United States,* 256 F.3d 1365, 1374 (Fed.Cir.2001) (Government not entitled to offset where it was "not responsible" for the alleged benefit); *see also Hansen Bancorp,* 53 Fed.Cl. at 107–08 (citing *Landmark* and holding that "no offset was required because the Government was not responsible for paying the dividend [that the Government sought to offset]").

### 2. Plaintiffs Did Not Bear the Burden of Mitigation

Throughout the trial, the Defendant urged the Court to deny the damages claims of the Individual Plaintiffs, asserting that they failed to mitigate the harm caused FIRREA. However, this misstates the law in a fundamental way. The Defendant, not the Plaintiffs, was obliged to mitigate damages.

> Where both the plaintiff and the defendant have equal opportunity to reduce the damages by the same act or expenditure, and it is equally reasonable to expect the defendant to minimize damages, the defendant will not be heard to say that the plaintiff should have minimized, and the plaintiff's award will not be reduced on account of damages the defendant could have avoided as easily as plaintiff.

DAN B. DOBBS, HANDBOOK ON THE LAW OF REMEDIES § 3.7 (1973); *see also S.J. Groves & Sons Co. v. Warner Co.,* 576 F.2d 524, 530 (3d Cir.1978).

In this case, "[T]he doctrine of avoidable consequences strongly argues that the government was in the best position to solve this problem." *Northeastern Pa. Shippers Coop. Ass'n., Inc. v. United States,* 32 Fed.Cl. 72, 78 (1994). Indeed, the rules of mitigation do not require the non-breaching party to subject itself to the risk of additional losses. *See, e.g., Fisher v. First Stamford Bank & Trust,* 751 F.2d 519, 524 (2d Cir.1984). This is especially true in the context of a highly fluid, unpredictable business sector such as the savings and loan/banking industry in the midst of a crisis and revolutionary new Federal regulations.

A party seeking recovery for damages due to a breach is subject to the requirement that they have not acted unreasonably so as to increase the damages which would otherwise exist. *See* 22 Am.Jur.2d Damages § 33. We find that the Individual Plaintiffs acted reasonably and diligently, and in accordance with their contractual duties under the RCMA, to assure that SoCal was capital compliant.

Nonetheless, the Defendant's mitigation argument provides an alternative measure of the damages to the Individual Plaintiffs. Upon questioning of each of the Individual Plaintiffs concerning their personal financial condition in 1992 and 1995, the Government seemed to urge upon the Court a theory that

each should have invested an additional amount of money proportionate to their original investment percentage, up to the $100 million total raised in the two recapitalizations. In response, Plaintiffs' counsel helpfully elicited the testimony that the Government, in 1992 and 1995, not surprisingly did not offer the Simons $29 million, the Thralls and the Doumanis $14 million each, or the Martins $7.5 million in cash.

The Government's proposed mitigation theory does provide an interesting method for calculating the amount of money both the Institutional and Individual Plaintiffs would have needed to mitigate the effects of the Government's breach. If the Government had paid these Plaintiffs $100 million during the recapitalization phase, SoCal the thrift would have been instantly repaired, and the Individual Plaintiffs would not have had their ownership interest taken from them. Nevertheless, as this did not happen, it is not an acceptable damages method, and we decline the Individual Plaintiffs' suggestion to adopt it.

## VII. *Conclusion*

SoCal is a *Winstar* success story. Not only was the Government's initial "supervisory goodwill" policy a success in this instance, but so were the efforts of those in charge of this particular thrift to satisfy the legislation reforming the industry.

As the Court learned during our extended trial, this institution, and these individuals, did not give up and walk away. Instead, with patience, time, money, and leadership, the Individual Plaintiffs and their management teams coaxed SoCal back to financial health and regulatory stability in the years following the S & L bailout. Because of these tremendous efforts, the thrift eventually thrived. As noted, SoCal went public in 1998, generating significant capital, and eventually, merged with another California bank in 2001. It is now one of the largest banks in California.

In his conclusion in the Glendale case, then-Chief Judge Loren A. Smith noted the following:

> The court recognizes that damages, particularly involving a thrift that entered a 40-year contract 18 years ago, which was breached nearly ten years ago, necessarily is not going to be found with the precision that one could determine damages resulting from the breach of a smaller, more discrete contract. But this should not, and cannot, defeat plaintiff's claim for damages.
>
> Put simply, the government should not be immunized from paying contract damages because the extent of both the contract and breach, and the time that has elapsed between the breach and today, makes it more difficult to calculate or conceptualize damages. The court has thus endeavored to deal as best as it can with the problems posed by the passage of time and the magnitude and complexity of the contract and the government's breach.

*Glendale,* 43 Fed.Cl. at 410.

We are faced with the same situation. Like Judge Smith, we have endeavored, in this, our sixth published opinion in this case, to craft the best possible remedy to compensate these Plaintiffs for the Government's breach of its valuable promises.

We were dismayed at the Government's tactics in the liability phase. Unfortunately, the Government's litigation position did not improve during trial. Indeed, despite a clear finding of breach and obvious harm and expense to the Institutional and Individual Plaintiffs, even to the end of the trial, the Government contended that none of the Plaintiffs were due even one penny in damages. While ordinary defendants are not obligated to offer a counter-theory of damages, we hold the Government to a higher standard. The Defendant continues to ignore the clear precedents of earlier *Winstar-*related damages cases.

Finally, we note that we have also experienced first-hand the Federal Circuit's observation that the "ascertainment of damages is not an exact science." *Bluebonnet,* 266 F.3d at 1355. We have followed their strict mandate not to preclude a damages award "where responsibility for damage is clear" because the amount cannot be quantified with "absolute exactness or mathematical precision." *Id.* Instead, we believe that the

"evidence adduced [at trial was] sufficient to enable [this Court] to make a fair and reasonable approximation" of the compensation necessary to redress the harms suffered. *Id.* The Court believes that the monetary judgments entered today are fair and reasonable and utterly supported by the voluminous factual record of the case.

**For the foregoing reasons, on Count 1, breach of an express contract, the Plaintiffs are entitled to recover the following amounts:**

| | | |
|---|---|---|
| The SoCal Plaintiffs | ..... | $65,397,821.41 |
| Roy Doumani | ..... | $ 6,223,280.00 |
| Preston Martin | ..... | $ 3,333,900.00 |
| The Simon Plaintiffs | ..... | $12,891,113.75 |
| Beverly Thrall | ..... | $ 6,223,280.00 |

### Additional Rulings

In order to permit a final judgment to be entered, we now address the remaining claims in the Plaintiffs' Amended Complaint. In a Joint Status Report filed July 21, 2003, the parties agreed that Counts 2, 3, and 4 of the Amended Complaint were subsumed in the Court's liability decision on Count 1 and are therefore moot. These Counts are dismissed with prejudice.

As to Count 5, the takings claim, the Government's position is that it is precluded by the Federal Circuit's ruling in *Castle v. United States,* 301 F.3d 1328 (Fed.Cir.2002), and should be dismissed for failure to state a claim upon which relief can be granted. The Plaintiffs stated that "if [they] are made whole by the Court's award of damages for breach of contract, they will move to dismiss Count 5 as moot." JSR, July 21, 2003. Because this Opinion today makes them whole, the Court hereby dismisses Count 5 as moot, and specifically declines to reach the Government's contention that the takings claim is barred by *Castle.*

Finally, as to Count 6, the due process claim, on July 21, 2003, the parties filed a Joint Notice of Dismissal with prejudice of that claim.

**Accordingly, the Clerk of Court is directed to enter judgments for the Plaintiffs consistent with this Opinion, and to dismiss the remainder of the Amended Complaint with prejudice.**

**No later than twenty days after this Opinion is filed, the Plaintiffs shall submit to the Court a Joint Notice stating the exact entities or individuals to whom the judgments shall be paid.**

The Defendant shall bear the allowable statutory costs of the trial on damages. The Plaintiffs shall file Bills of Costs with the Clerk of Court.

**IT IS SO ORDERED.**